745 F.2d 786
 39 Fed.R.Serv.2d 1444, 1984-2 Trade Cases 66,211
 Malcolm WEISS, Appellee in Nos. 82-3507 & 82-3580,
Cross-Appellant in No. 82-3581
v.
YORK HOSPITAL and the Medical and Dental Staff of York
Hospital, S. Philip Laucks, M.D.; Harold H. MacDougall,
M.D., Ian L. MacKenzie, M.D., John P. Whitely, M.D., S.W.
Deisher, M.D., (Executive Committee--Jack A. Kline, M.D.,
Lois M. Kushner, Ivan L. Butler, M.D., Gary Ardison, M.D.,
and Thomas L. Bauer, M.D., Appellants in Nos. 82-3507 &
82-3580, Cross-Appellees in No. 82-3581.
 Nos. 82-3507, 82-3580 and 82-3581.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 15, 1983.
Decided Sept. 27, 1984.
 
 Arnold Levin, Michael D. Fishbein (argued), Levin & Fishbein, Philadelphia, Pa., Lewis H. Markowitz, Marc G. Tarlow, Markowitz & Seidensticker, York, Pa., for Malcolm Weiss, appellee in Nos. 82-3507 & 82-3580, cross-appellant in No. 82-3581.
 Stuart H. Savett (argued), David H. Weinstein, Robert J. LaRocca, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., Robert J. Brown, Kain, Brown & Roberts, York, Pa., for appellants in Nos. 82-3507 & 82-3580, cross-appellees in No. 82-3581.
 Roland Morris, H. Buckley Cole, Duane, Morris & Heckscher, Philadelphia, Pa., for amicus curiae, The Hosp. Ass'n of Pennsylvania.
 Before ADAMS* and BECKER, Circuit Judges, and VAN DUSEN, Senior Circuit Judge.OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 I. Introduction and General Background - 791
 
 II. The Facts - 793
 A. Hospital Services in the York MSA - 793
 
 2
 B. Discrimination Against D.O.'s at York - 794
 
 
 3
 C. Staff Privileges Application Precedure - 796
 
 
 4
 D. Doctor Weiss' Application for Staff Privileges - 797
 
 III. Procedural History and Problems - 799
 A. Before the Distrit Court - 799
 B. Appellate Jurisdiction - 801
 
 5
 (1) The Defendants' December 9 Appeal - 802
 
 
 6
 (2) The Plaintiff's December 13 'Cross-Appeal - 803
 
 C. Class Certification - 804
 
 7
 (1) The Necessity of Proof of Demand - 805
 
 
 8
 (2) The Requirements of Fed.R.Civ.P. 23 - 807
 
 
 9
 (a) Rule 23(a) - 807
 
 
 10
 ( i) Numerosity - 807
 
 
 11
 ( ii) Commonality - 808
 
 
 12
 (iii) Typicality - 809
 
 
 13
 ( iv) Adequacy of Representation - 811
 
 
 14
 (b) Rule 23(b)(2) - 811
 
 
 15
 D. The Vicinage Requirement of 28 U.S.C. § 1393(a) - 811
 
 IV. The Sherman Act Claims - 812
 A. Section 1 of the Sherman Act - 812
 
 16
 (1) Proof of an Agreement; Is There a Sufficient Number of
 
 Conspirators? - 813
 
 17
 (2) Proof of Restraint of Trade - 817
 
 
 18
 (a) Introduction - 817
 
 
 19
 (b) Is the Defendants' Exclusionary Conduct the Equivalent of a
 
 
 20
 Concerted Refusal to Deal (Boycott)? - 818
 
 
 21
 (c) The 'Learned Profession' Exception - 820
 
 
 22
 (d) The District Court's Charge and The Sherman Act Section 1
 
 Verdict as to Weiss - 822
 
 23
 (3) Substantiality of Effect on Interstate Commerce - 824
 
 B. Section 2 of the Sherman Act - 825
 
 24
 (1) Relevant Market - 825
 
 
 25
 (2) Monopoly Power - 827
 
 
 26
 (3) Willfull Acquisition or Maintenance of Monopoly Power - 827
 
 
 27
 C. The Propriety and Scope of the Injuction Under Section 16 of the
 
 Clayton Act - 828
 V. Conclusion - 831
 I. INTRODUCTION AND GENERAL BACKGROUND
 
 28
 This antitrust case arises from the refusal to grant hospital staff privileges to a physician. The plaintiff, Malcolm Weiss, is an osteopath[1] who was denied staff privileges at York (Pennsylvania) Hospital. Dr. Weiss brought this suit, both individually and as representative of the class of all osteopathic physicians in the York Medical Service Area (York MSA),[2] against York Hospital ("York"), the York Medical and Dental Staff, and ten individual physicians who served on the York Medical Staff Executive Committee and the York Judicial Review Committee. York is controlled by, and, at the time Dr. Weiss applied for staff privileges, was exclusively staffed by doctors who graduated from allopathic medical schools.[3]
 
 
 29
 The gravamen of Weiss' lawsuit is that, although allopaths (hereinafter referred to as medical doctors or M.D.s) and osteopaths (D.O.s) are equally trained and qualified to practice medicine,[4] his application for staff privileges at York hospital was turned down solely because of his status as an osteopath. Generally, a physician can admit and treat patients only at hospitals where he has staff privileges. If a patient desires to receive medical treatment at a hospital for which that patient's doctor does not have staff privileges (either because the patient prefers the reputation of that hospital or because that hospital is the only available hospital with equipment that is necessary for the patient's treatment) then the patient's doctor will have to refer the patient to another physician who has staff privileges at the hospital in question. See Weiss v. York Hospital, 548 F.Supp. 1048, 1053 (M.D.Pa.1982) (finding of fact, No. 32-34). As the result of such a referral the first doctor loses the opportunity to treat (and therefore to charge) the patient.
 
 
 30
 In addition, Weiss alleged that the treatment that he received at the hands of the M.D.s who control York sent a message to other D.O.s in the York MSA not to apply for staff privileges at York. In Weiss' submission, this scheme to exclude D.O.s from York Hospital was motivated by a desire to restrict the ability of D.O.s to compete with M.D.s, thereby increasing the profits of the M.D.s. Weiss contends that this conduct violates sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1 & 2, and state law (tortious interference with contractual relations).
 
 
 31
 The district court bifurcated the trial. The liability phase commenced on August 11, 1982, and on September 1, 1982, the jury returned unanimous answers to 42 special verdict questions. The district court molded the jury's responses into findings of liability in favor of the class (but not Weiss) and against the medical staff on the section 1 claim; in favor of Weiss and the class and against the hospital on the section 2 claim; and in favor of Weiss and against the hospital and four of the individually named defendants on the state law claims. All other defendants were exonerated on all other claims. Adopting the jury's findings of fact (by which it considered itself bound), the district court thereupon entered a final injunction against the hospital and the medical staff pursuant to section 16 of the Clayton Act, 15 U.S.C. Sec. 26, essentially prohibiting them from future discrimination against osteopaths. In addition, the district court scheduled a second trial to determine damages based on plaintiffs' claim for treble damages under section 4 of the Clayton Act, 15 U.S.C. Sec. 15, ordered that all class members be notified of their right to apply for damages. Prior to commencement of that trial, defendants and plaintiffs brought these appeals.
 
 
 32
 The case raises a number of complicated legal questions. Our opinion is divided into five parts. Part I is this introduction and general background. In part II we detail the facts. Part III discusses a number of preliminary issues, including the extent of our appellate jurisdiction over the questions presented by the appeals, the propriety of the class certification, and the proper vicinage for the jury trial in this case. We hold that we have no appellate jurisdiction to review the defendants' challenges to the district court's findings of liability under section 1 and 2 of the Sherman Act to the extent that those findings relate solely to plaintiffs' claims for treble damages under section 4 because there is no final judgment as to these claims, and no exception to the final judgment rule applies. We reach the same conclusion with respect to the state law claims. We thus limit this opinion to a review of questions raised by the district court's issuance of an injunction under section 16 and its exoneration of some of the defendants on some of plaintiff's claims. We also hold that the class certification was proper and that the trial was held in an appropriate location.
 
 
 33
 In part IV we turn to the heart of this appeal: a review of the findings of liability under sections one and two of the Sherman Act against the hospital and the medical staff, and the consequent issuance of an injunction under section 16 of the Clayton Act. We affirm the court's issuance of an injunction against the medical staff for violating section 1, an injunction that also benefits Weiss. However, we reverse the district court's grant of an injunction against the hospital for violating section 2 because we believe that that plaintiff has failed to adduce sufficient evidence to enable him to carry his burden of demonstrating that the hospital engaged in any willful behavior designed to acquire or maintain its monopoly power. Because of a problem with the jury charge we grant a partial new trial on the question of Weiss' professional competence and character, a factor relevant to the defendants' defenses to Weiss' section 1 damage claims. In addition, we affirm, as supported by the evidence, the district court's exoneration of various defendants on various claims. We then review the scope of the injunction issued by the district court and conclude that, given our substantive decisions on the questions of liability under sections 1 and 2, the district court should be given the opportunity to re-consider the appropriate scope of injunctive relief in the first instance. Part V contains a summary of our conclusions.
 
 II. THE FACTS[5]
 A. Hospital Services in the York MSA
 
 34
 There are two providers of in-patient hospital services in the York MSA: York, which is run by M.D.s, and Memorial Hospital ("Memorial"), which is run by D.O.s. York is by far the larger of the two, with approximately 450 beds and 2,500 employees. Memorial has 160 beds.[6] The testimony at trial established that York had a market share of 80% of the patient-days of hospitalization in the York MSA.
 
 
 35
 In addition to York's overall market dominance, testimony at trial established that certain complex, highly technical "tertiary care"[7] services and facilities are, for a number of reasons, only available at York.[8] Included among the services offered only at York are therapeutic radiology, open heart surgery, cardiac catheterization, renal dialysis, neo-natal intensive care, short-term acute psychiatric care, monitored stroke treatment, audiology, burn care, cardiopulmonary laboratory, cardiopulmonary rehabilitation, electroencephalography, genetic counseling, prosthetic service, speech therapy, computerized axial tomography (CAT scan),[9] and infusion aspirator.
 
 B. Discrimination Against D.O.s at York
 
 36
 Prior to 1974, both York hospital's corporate charter and the bylaws of the York medical staff barred D.O.s from obtaining staff privileges at York. "Without staff privileges, a physician cannot admit, effectively follow, or treat patients at York Hospital." Weiss, 548 F.Supp. at 1053 (finding of fact No. 32). Consequently, whenever a patient of a D.O. wanted to go to York for treatment, either because the patient preferred the reputation and size of York over Memorial, or because the patient required tertiary care services that were available only at York, the treating D.O. had no choice but to refer the patient to an M.D. with staff privileges at York. Weiss, 548 F.Supp. at 1053 (finding of fact No. 33).
 
 
 37
 The evidence adduced at trial indicated several ways in which D.O.s were economically disadvantaged as a result of this discrimination. First, D.O.s lost fees directly when one of their patients was admitted for treatment at York. Obviously, if the patient required treatment that the D.O. was qualified to provide but could perform only at York, the D.O. lost the fees that would ordinarily be charged for those services. Moreover, even if the patient required services that the D.O. was not qualified to provide, the D.O. lost the fees for those non-specialized services provided to patients both before and after the specialized care that he was qualified to perform but which had to be performed in York Hospital by an M.D. It is primarily the loss of these latter fees, derived from monitoring a patient who is receiving tertiary care from a specialist, that economically disadvantaged general practice D.O.s, who were forced to refer patients needing tertiary care to a general practice M.D. with staff privileges at York.
 
 
 38
 D.O.s were also indirectly disadvantaged as the result of York's discriminatory policy. When patients of D.O.s were referred to M.D.s in order that they could be treated at York, they sometimes did not return to the referring D.O. after the treatment at York was completed, but instead remained in the care of the referred M.D. See Weiss, 548 F.Supp. at 1053 (finding of fact No. 35). Thus the referring D.O. lost the patient not just for purposes of the immediate treatment at York, but for purposes of subsequent medical care which the D.O. was qualified to provide.[10] Additionally, the evidence established that the absence of staff privileges is a competitive disadvantage, in that it indicates to patients that the doctor is a second-class practitioner. See Weiss, 548 F.Supp. at 1052-53 (findings of fact Nos. 29 & 35).[11] Both of these factors placed D.O.s at a competitive disadvantage vis-a-vis M.D.s in obtaining and retaining patients.
 
 
 39
 In 1974 York amended its corporate charter to allow osteopathic physicians to practice at York. Osteopaths were still barred from admission to York, however, because of the prohibition in the medical staff bylaws. Nevertheless, in early 1976, Weiss and another osteopath named Dr. Michael Zittle, both of whom were engaged in family practice in the York MSA, applied for staff privileges at York. Dr. Weiss informed representatives of the York medical staff that if York excluded him because of his osteopathic training he would institute legal action.
 
 
 40
 The York medical staff considered the applications and Weiss' threat of legal action, and in November of 1976 amended its bylaws to permit admission of osteopaths at York. Dr. Weiss' contends that the amendment of the bylaws was purely cosmetic, and that since 1976 the York medical staff has engaged in a deliberate covert policy of discrimination against osteopaths. In support of this contention Weiss offered evidence that York had a historical presumption in favor of admitting any M.D. who applied for staff privileges, regardless of the applicant's medical ability or social graces,[12] but that in the case of D.O. applicants York engaged in "strict scrutiny" of the applicant's medical qualifications, and, in addition, considered the applicant's social acceptability. If the D.O. was found lacking, even minimally, in either area, his application was denied. Finally, Weiss adduced evidence that in the evaluation process for D.O.s (but not M.D.s), York relied on hearsay as grounds for rejecting an application for staff privileges. Because "[t]he denial of hospital staff privileges to a physician or the revocation of such privileges is a serious adverse professional event which is likely to besmirch the professional reputation of such a physician." Weiss, 548 F.Supp. at 1052 (finding of fact No. 29), the district court found that application of the strict scrutiny standard to Weiss' application for staff privileges, and the consequent denial of Weiss' application, "could reasonably be anticipated to cause [other] osteopathic physicians to refrain from applying for staff privileges at York Hospital." Weiss, 548 F.Supp. at 1053 (finding of fact No. 31).[13]
 
 
 41
 In addition to discriminating against D.O.s in the admissions process. Weiss also offered evidence that York automatically gave any D.O. who survived the strict scrutiny of that process the lowest category of staff privileges offered by York, that of "Assistant Staff," regardless of the D.O.'s actual skill level. Under the Assistant Staff category of privileges the physician is required to consult with other members of the department in the care and treatment of his patients. By contrast, M.D.s who applied for and received staff privileges at York were given different levels of staff privileges depending on their level of skill as certified by the various M.D. specialty Boards. See Weiss 548 F.Supp. at 1051, 1060, & 1061 (finding of fact No. 8, conclusion of law No. 1, & order Nos. 1.1 & 1.3). The alleged effect of this discrimination was to brand D.O.s as second class doctors.
 
 C. Staff Privileges Application Procedure
 
 42
 When a physician applies for staff privileges at York, the following procedure is customarily followed. After the applicant's background and reference information has been gathered, the chairman of the hospital department in which the applicant seeks privileges evaluates the application. In the Family Practice Department, to which Weiss applied, the department chairman selects a department credentials committee to assist the chairman in formulating the evaluation. Once the department makes a recommendation, the Medical Staff's Credentials Committee reviews the application and related file, including the (Family Practice) department's recommendation, and formulates its own recommendation to the Medical Staff Executive Committee. The Medical Staff Executive Committee independently reviews the application and related file and formulates a recommendation on the application to the hospital's Board of Directors.[14]
 
 
 43
 The hospital Board of Directors then refers the application to its standing Medical Affairs Committee, which recommends a disposition of the application. Finally, based on the applicant's file and the various recommendations of the committees, the Board of Directors decides whether to accept or reject the application. If either the Medical Staff Executive Committee or the hospital's Board of Directors makes an adverse decision, the applicant is informed in writing. The applicant may, at that point, request and obtain (1) a written statement of the reasons for the recommendation or decision, and (2) the impanelling of a "judicial review" committee composed of physicians who have had no part in the consideration of the application to that point. The judicial review committee is authorized to hear testimony and receive other evidence to determine whether the adverse recommendation on the application was "in error, unreasonable, arbitrary, or capricious." The applicant is entitled to attend the hearing, to call witnesses and introduce evidence, to cross-examine and impeach witnesses, and otherwise to rebut adverse evidence.[15]
 
 
 44
 D. Doctor Weiss' Application for Staff Privileges
 
 
 45
 In 1976 Doctors Weiss and Zittle applied for staff privileges in York's Family Practice Department. In accordance with the procedures outlined above, the Family Practice Department Credentials Committee and the chairman of the Family Practice Department considered the applications. On January 17, 1977, the department recommended that they be accepted. The Medical Staff Credentials Committee then reviewed the applications and also recommended acceptance. The Medical Staff Executive Committee, however, did not approve either application. Instead, it took the unusual step of deciding to conduct a further investigation.[16] The Committee made extensive oral and written inquiries concerning the professional competence and moral character of both Weiss and Zittle. No such survey had ever before been conducted by the hospital before. Ultimately the investigation turned up some questions about Dr. Weiss' personality.[17] The investigation also raised some glimmer of a question about Dr. Weiss' medical competence, but the sole "evidence" that was adduced was hearsay, often second or third level hearsay.[18] Nevertheless, the Medical Staff Executive Committee, apparently based on this "new evidence," decided not to recommend Weiss for staff privileges.
 
 
 46
 On June 30, 1977, the hospital Board of Directors considered the recommendations of the various committees which had considered Weiss' and Zittle's applications. The Board voted to approve Zittle's application and deny Weiss' application. Notice of the Board's action was sent to Weiss the same day.
 
 
 47
 On August 19, 1977, following meetings with York officials, Weiss requested that his application be reactivated and hence reconsidered. This request was granted, and Weiss again received the favorable recommendation of the Family Practice Department's Credentials Committee, and the Family Practice Department chairman. The Credentials Committee's written report is revealing in both its assessment of the "evidence" against Weiss, and in its frank recognition of the "controversy" at York over the admission of D.O.s to staff privileges:
 
 
 48
 The Committee invited Dr. Weiss to discuss the reactivation of his application and to direct certain questions to him. He was told of the developments in the past and precisely how his application has been handled and of the problems that had arisen. He was specifically told that almost everybody with whom we spoke acknowledged him to be an intelligent, competent, conscientious physician whose care of his patients in the Hospital was quite competent. He was told that the Chairman of his Department suggested that he probably was the best general practitioner. However, almost everyone to whom we spoke acknowledged that he has had personality problems in the past which have caused him to have difficult interpersonal relations with other members of the staff. He was told that because of this personality problem, his application was rejected. It was further explained to him that because of the controversy that accompanied the application of osteopaths to the York Hospital, it was felt that acceptance of his application would jeopardize that endeavor. We explained to Dr. Weiss that his admission to the staff would be met in some instances with outright hostility and in others with indifference and it was a matter of real concern to the Committee how he would react to this sort of reception.
 
 
 49
 Weiss replied that he felt his personal problems had been overstated....
 
 
 50
 He was questioned at length by every member of the Committee concerning his background, his motivation and his reputed personality problems. Dr. Weiss conducted himself throughout the interview in a professional manner and responded to a number of very difficult questions in a positive, constructive fashion.
 
 
 51
 .... Although the Committee has pursued every allegation in his folder diligently with numerous conversations with numerous people it was unable to find one person who could specifically confirm any of the allegations. The Committee was left with the realization that all the allegations were hearsay, that it was left without one witness who could take the stand and make an intelligent case before a judge or jury. Furthermore, it was the opinion of the Committee after today's interview that Dr. Weiss recognizes the position in which he has placed himself and that he will probably conduct himself in a very careful, cautious, professional manner should he be accepted to the staff at York Hospital.
 
 
 52
 On February 28, 1978, the Medical Staff Credentials Committee voted to recommend again that Weiss' renewed application be accepted. However, on March 6, 1978, the Medical Staff Executive Committee again voted to recommend that the application be denied.[19]
 
 
 53
 Weiss' application was next referred to the Medical Affairs Committee of the hospital's Board of Directors. This committee directed that the members of the Family Practice Department Credentials Committee, the Medical Staff Credentials Committee, and the Medical Staff Executive Committee meet informally to attempt to reach a consensus on Weiss' application. The members of these committees then met on March 20, 1978, and voted to recommend that Weiss' application be denied.[20] The Medical Staff Executive Committee then met on April 19, 1978, to re-reconsider Weiss' application and, for the third time, voted to recommend that the hospital Board of Directors deny the application.
 
 
 54
 On April 21, 1978, York sent Weiss written notice of the April 19, 1978, unfavorable recommendation of the Medical Staff Executive Committee. Upon being advised of the decision of that Committee, Weiss requested and received a statement of reasons. Weiss' status as a D.O. rather than a M.D. was not one of the reasons cited by the Committee in its official statement of reasons. Weiss also requested an appeal to a "judicial review" committee as provided for in the hospital bylaws.
 
 
 55
 A "Judicial Review" Committee was impanelled[21] and a hearing was held. Weiss was present and represented by counsel at this proceeding. After reviewing all the evidence, the committee, on December 28, 1978, determined unanimously that the decision of the Medical Staff Executive Committee not to recommend Weiss for staff privileges was not unreasonable, arbitrary, or capricious. The committee also determined, with one member dissenting, that the Medical Staff Executive Committee was not in error in its recommendation.
 
 
 56
 The hospital Board of Directors then held a special meeting at which presentations were made by counsel for Weiss and special counsel for the Hospital. On March 13, 1979, the Board voted to deny Weiss staff privileges.
 
 III. PROCEDURAL HISTORY AND PROBLEMS
 A. Before the District Court
 
 57
 On February 6, 1980, Weiss filed this suit in the United States District Court for the Middle District of Pennsylvania. The complaint named as defendants York Hospital, the York Hospital Medical and Dental Staff, and ten individual members of the York medical staff: the five physicians who in their capacity as members of the Medical Staff's Executive Committee voted on Dr. Weiss' application for privileges, and the five physicians who constituted the Judicial Review Committee that was specially impanelled to review the Executive Committee's recommendation that Weiss not be given staff privileges at York.[22] Weiss' complaint alleged that his application for staff privileges at York was denied because of: (1) a concerted refusal to deal with him and all other osteopathic physicians located in and around York, Pennsylvania, in violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1; (2) monopolization, attempted monopolization, and conspiracy to monopolize in violation of section 2 of the Sherman Act, 15 U.S.C. Sec. 2; and (3) violation of Pennsylvania antitrust and common law. The alleged relevant geographic market coincided with the York MSA. The district court certified the class of all osteopaths in the York MSA as the plaintiff class.[23]
 
 
 58
 The liability issues were tried to a jury for three weeks in September, 1982. At the end of the trial the court submitted 42 special verdict questions to the jury. The jury answered all the questions unanimously. The district court molded the jury's answers into findings of fact,[24] and, based on these findings, the court reached the following conclusions of law:
 
 
 59
 1. On the Sec. 1 claim, the staff (but not the hospital) is liable to the plaintiff class but not to Weiss;
 
 
 60
 2. On the Sec. 2 claims, the hospital (but not the staff) is liable to both Weiss and the class for monopolization, attempted monopolization, and conspiracy to monopolize;
 
 
 61
 3. On the pendent state law claims, the hospital (but not the staff) and four physicians are liable to Weiss but not the class for interference with contractual relations; and
 
 
 62
 4. The remaining six physician defendants are not liable to anyone for anything.
 
 
 63
 Weiss, 548 F.Supp. at 1060-62.[25] The court then held an additional one-day hearing to consider plaintiff's request for equitable relief. Based on the jury's answers to the special verdict questions, the court's findings of fact and conclusions of law, and the additional hearing on equitable relief, the district court entered a final order pursuant to section 16 of the Clayton Act, 15 U.S.C. Sec. 26, enjoining the hospital and the medical staff from:
 
 
 64
 1. undertaking any act against Weiss or the class "which would in any way impede or deny the Plaintiffs full, reasonable, fair, or equal access to the facilities of York Hospital and full, reasonable, fair or equal access to staff privileges at the York Hospital;"
 
 
 65
 2. "applying standards of review to applications by osteopathic physicians for staff privileges at the York Hospital different from the standards of review applicable to similar applications of allopathic physicians," and
 
 
 66
 3. "interpreting the expression 'American Board of Medical Specialty' as used in the York Hospital Medical Staff By-Laws to exclude osteopathic boards of medical specialty."
 
 
 67
 Weiss, 548 F.Supp. at 1061.
 
 
 68
 In addition to entering the injunction, the district court also entered the following "judgment on special verdict":
 
 
 69
 JUDGMENT ON SPECIAL VERDICT--"that the York Hospital Medical and Dental Staff is liable to the Plaintiff Class for violations of Section 1 of the Sherman Act: Further, that the York Hospital is liable to Plaintiff Malcolm Weiss and the Plaintiff Class for violations of Section 2 of the Sherman Act: Further, that the York Hospital, Thomas L. Bauer, M.D., Ivan L. Butler, M.D., S.W. Deisher, M.D. and Lois Kushner, M.D., are liable to Plaintiff Malcolm Weiss for tortiously interfering with his contractual relations with third parties. It Is Further Adjudged that Gary Ardison, M.D., Jack A. Kline, M.D., S. Philip Laucks, M.D., Harold H. MacDougall, M.D., Iain L. MacKenzie, M.D. and John P. Whiteley, M.D., are not liable to either Plaintiff Malcolm Weiss or the Plaintiff Class: Further, that as against the Defendants named in the preceding paragraph Plaintiff Malcolm Weiss and the Plaintiff Class shall take nothing and this action shall be dismissed" as to them.
 
 
 70
 Weiss, 548 F.Supp. at 1062. On October 12, 1982, the defendants moved the district court to certify this "judgment on special verdict" as final pursuant to Fed.R.Civ.P. 54(b). Plaintiff opposed this motion for certification by memorandum filed October 27, 1982. On November 18, the district court granted the defendants' motion and entered the following order:
 
 
 71
 1. The defendants' motion for certification is granted.
 
 
 72
 2. This Court hereby certifies that there is no just reason for the delay of an appeal in this case.
 
 
 73
 3. The Clerk of Court is hereby directed to amend the judgment on special verdict entered September 30, 1982, as follows:
 
 
 74
 It is ordered that the judgment on Special Verdict entered on September 30, 1982, is final pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.
 
 B. Appellate Jurisdiction
 
 75
 Three appeals have been filed in this case. The first is an appeal filed on October 28, 1982, by the hospital and staff from the district court's injunction which was entered on September 30, 1982. The second appeal is by the hospital, the staff, and the four individual defendants who were found liable to the plaintiffs under the Sherman Act and state law; this appeal was filed on December 9, 1982, from the "order and final judgment entered 11/18/82 and order entered 11/22/82 denying these defendants' motion for judgment notwithstanding verdict or for a new trial and all other orders, rulings and judgments of the court." The third appeal was filed on December 13, 1982, by the plaintiff. This appeal is denominated a "cross-appeal" and is from the "orders directing judgment in favor of certain defendants which became final on November 18, 1982."
 
 
 76
 The defendants' appeal from the grant of the injunction is authorized by 28 U.S.C. Sec. 1292(a)(1) and therefore it is clearly before us.[26] The viability of the other two appeals presents much more difficult questions. Because the two appeals raise different problems, we consider them separately.
 
 1. The Defendants' December 9th Appeal
 
 77
 The December 9th appeal by the defendants purports to be from the "judgments" (other than the injunction) that resulted from the district court's September 30th "special verdict." However, because the trial was bifurcated and additional proceedings, including the determination of certain defenses and of damages, are yet to take place, most of these "judgments" (i.e., those not resulting in verdicts for the defendants) are not final within the meaning of 28 U.S.C. Sec. 1291, see Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945) (a "final decision" for purposes of 28 U.S.C. Sec. 1291 "is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment"); Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1321 (5th Cir.1976) ("a finding of 'liability' in Phase I of a bifurcated trial is interlocutory"); see also Sun Shipbuilding & Dry Dock Co. v. Benefits Review Board, 535 F.2d 758, 760 (3d Cir.1976). Moreover, as to those judgments in defendants' favor, having prevailed, they cannot appeal. Therefore, it would appear that we have no jurisdiction to hear this appeal.
 
 
 78
 The defendants argue, however, that we have jurisdiction because of the November 18, 1982, order of the district court certifying the September 30, 1982, "judgment on special verdict" as final pursuant to Fed.R.Civ.P. 54(b).[27] Rule 54(b), however, does not authorize the district court to certify non-final decisions as final; rather, the Rule's purpose is to permit the district court to separate out final decisions from non-final decisions in multiple party and/or multiple claim litigation in order to allow the losing party an immediate appeal. See Liberty Mutual Ins. Co. v. Wetzel, 424 U.S. 737, 742-44, 96 S.Ct. 1202, 1205, 1206, 47 L.Ed.2d 435 (1976) (partial summary judgment limited to the issue of liability, which reserves the issue of damages and other relief, is not "final" within the meaning of 28 U.S.C. Sec. 1291).
 
 
 79
 The defendants' December 9th appeal must therefore be dismissed for two reasons. First, all of the final decisions that resulted from the September 30th "judgment on special verdict" were in favor of the defendants and the defendants cannot appeal decisions that they have won. Second, because additional portions of the bifurcated trial have not yet been held, all the "judgments" against the defendants arising out of the September 30th special verdict are non-final and therefore not appealable under 28 U.S.C. Sec. 1291. Furthermore, these non-final "judgments" do not fall within any of the limited exceptions for interlocutory appeals.[28] Thus, this Court is without appellate jurisdiction to hear the defendants' December 9, 1982, appeal.
 
 
 80
 The defendants suggest that even if the non-final decisions that resulted from the special verdict are otherwise non-appealable, we can review those decisions under the doctrine of "pendent appellant jurisdiction," citing Kershner v. Mazurkiewicz, 670 F.2d 440, 448 (3d Cir.1982) (in banc). In Kershner, Judge Adams, speaking for the full Court, narrowly construed the pendent appellate jurisdiction doctrine stating:
 
 
 81
 If the ... issue appealable under section 1292(a)(1) cannot be resolved without reference to the otherwise nonappealable ... issue--either because the latter issue directly controls disposition of the former, or because the issues are, in some other way, inextricably bound--then both issues must be addressed in order to resolve properly the section 1292(a)(1) ... issue. In such a situation, the appellate court has no choice: any more limited review would deprive the appellant of his or her congressionally mandated right to a section 1292(a)(1) interlocutory appeal. If, on the other hand, the appellate court can dispose of the section 1292(a)(1) appeal without venturing into otherwise nonreviewable matters, its jurisdiction should be limited accordingly.
 
 
 82
 Id. at 449 (emphasis in original; footnotes omitted). See also Allegheny County Sanitary Authority v. U.S.E.P.A., 732 F.2d 1167, 1173 (3d Cir.1984).
 
 
 83
 In applying the Kershner doctrine to this situation, we understand that, to the extent that there are factual or legal issues that must be resolved in ruling on the appealable orders, our holdings on those issues will be the law of the case and control in possible future appeals. However where, as here, there are significant issues involved in the non-appealable orders which are (or may be) different from issues involved in the appealable orders, we do not have pendent appellate jurisdiction to review those non-appealable orders. For example, while we conclude, infra text accompanying notes 30-32, that there is no requirement that each member of the plaintiff class must make a demand for staff privileges in order for the class to qualify for injunctive relief pursuant to section 16, we specifically reserve the question whether a demand is required in order to recover treble damages pursuant to section 4. This latter issue is not "inextricably bound" with the appeal from the injunction and therefore we may not exercise pendent appellate jurisdiction to decide it. Similarly none of the issues involved in the non-final state law claims are inextricably bound up with the appeal from the injunction or the appeal for the dismissed state law claims and therefore these issues are also not appealable. In sum, the Kershner doctrine does not save the defendants' December 9th appeal.
 
 
 84
 2. The Plaintiffs' December 13th "Cross-Appeal"
 
 
 85
 The plaintiff appealed from a number of final judgments against the plaintiff and the plaintiff class, in the December 13th cross-appeal. As to plaintiff Weiss there are final judgments:
 
 
 86
 (1) in favor of defendant York on his section 1 claim;
 
 
 87
 (2) in favor of the defendant medical staff on all claims (sections 1 and 2 and state law); and
 
 
 88
 (3) in favor of defendants Ardison, Kline, Laucks, MacDougall, MacKenzie, and Whiteley on all claims, and in favor of defendants Bauer, Butler, Deisher, and Kushner, on the sections 1 and 2 claims.
 
 
 89
 As to the plaintiff class there are final judgments:
 
 
 90
 (1) in favor of defendant York on the section 1 claim;
 
 
 91
 (2) in favor of the defendant medical staff on the section 2 claim; and
 
 
 92
 (3) in favor of all individual defendants on the sections 1 and 2 claims.
 
 
 93
 Since the district court's order certifying the "special verdict" pursuant to Rule 54(b) does not distinguish what decisions have been certified, we assume that the court intended to certify every final judgment that resulted from the special verdict, including those against the plaintiff and the plaintiff class. It would therefore seem that, because the plaintiff filed his notice of appeal within thirty days of the Rule 54(b) certification, the judgments listed are properly before us.
 
 
 94
 There is, however, one potential problem of jurisdiction over the plaintiffs' cross-appeal. Rule 54(b) certification was sought by the defendants, and actively opposed by the plaintiff. The district court granted the certification, but its order did not indicate which "judgments" it intended to certify. Thus it may be that the certification brings up only those claims on which a final decision was entered against the defendants. But all of the potentially appealable decisions in this case are against the plaintiff. Apparently the defendants (and the district court) thought that the Rule 54(b) certification would make the claims on which the plaintiff won on the liability issue, but for which the question of damages had not yet been tried, appealable, a belief we have shown to be erroneous. Had the defendants realized that their Rule 54(b) certification motion would accomplish nothing for them, but might result in bringing up for review judgments in their favor which plaintiffs had not initially sought to have have reviewed at that stage, they might not have sought a Rule 54(b) certification. The question, then, is whether the combination of the "blanket" Rule 54(b) certification issued at the defendant's request and over the plaintiffs' opposition, and the plaintiffs' cross-appeal, are sufficient to bring before us the final decisions against the plaintiffs.
 
 
 95
 We have been unable to find any cases or treatises that discuss the efficacy of a Rule 54(b) certification issued at the behest of a party against whom there are no final judgments, or by the district court sua sponte. We nevertheless conclude that the policy of Rule 54(b) to permit immediate appeals from final decisions in complex litigation renders the district court's Rule 54(b) certification efficacious under the circumstances of this case, i.e., where: (1) the plaintiffs' appeal is from several final decisions; (2) the parties have briefed and argued the legal questions already; and (3) we have to review the propriety of the injunction which is based on the same factual circumstances as the various final judgments against the plaintiffs and involves most of the same legal issues. The plaintiffs' cross-appeal is thus properly before us.[29]
 
 C. Class Certification
 
 96
 The district court granted the plaintiff's motion for class certification, determining that the action could be maintained pursuant to Fed.R.Civ.P. 23(b)(2) on behalf of a class of all osteopathic physicians practicing medicine in the York MSA. The defendants attack the class certification on several grounds.
 
 1. The Necessity of Proof of Demand
 
 97
 The defendants contend that the law of this Circuit is "clear" that where a claim is based upon an unlawful refusal by defendant to deal with the plaintiff, that plaintiff--and hence each class member--must allege and prove a demand which the defendant rejected. In support of this proposition the defendants cite Mazus v. Dept. of Transportation, Commonwealth of Pa., 629 F.2d 870 (3d Cir.1980), cert. denied, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981), and Lawlor v. Nat'l Screen Service Corp., 270 F.2d 146, 154 (3d Cir.1959), cert. denied, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742 (1960). But we are not here faced, as in those cases, with the question whether each member of the class must have made a demand and have been rejected in order to obtain damages from the defendants (that question is posed by the dismissed appeals). We thus find these cases to be inapposite to the limited issue before us on these appeals--i.e., whether the law requires as a prerequisite to injunctive relief that each member of the (b)(2) class have had an application for staff privileges rejected by the hospital.[30] We thus turn to analysis of the question.
 
 
 98
 A private antitrust claim has two parts. A plaintiff must demonstrate "a violation of the antitrust laws"--in this case sections 1 and 2 of the Sherman Act--and he must also prove the right to either the treble damage remedy given by section 4 of the Clayton Act or the equitable remedy afforded by section 16 of that Act. See Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573 (3d Cir.1979). Cf. Double H Plastics, Inc. v. Sonoco Products Co., 732 F.2d 351 (3d Cir.1984) (Gibbons, J., dissenting). In a case challenging market exclusion under section 1 of the Sherman Act, the formation of a conspiracy with the requisite exclusionary purpose forms the essence of the violation. See generally Silver v. New York Stock Exchange, 373 U.S. 341, 347, 83 S.Ct. 1246, 1251, 10 L.Ed.2d 389 (1963); Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); American Medical Association v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943). Similarly, under section 2 of the Act, it is the willful acquisition or maintenance of monopoly power that is the essence of the offense. See generally Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). United States v. Terminal Railroad Ass'n of St. Louis, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed.2d 810 (1912). In both instances, the violation is based on the defendant's conduct, rather than on the effect on the plaintiff. On the question of appropriate relief under section 4 or 16, however, effect on the plaintiff becomes critical. This is demonstrated by a comparison of the language of the two sections and the caselaw thereunder.
 
 
 99
 Section 4 of the Clayton Act, 15 U.S.C. Sec. 15, provides:
 
 
 100
 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
 
 
 101
 As in the case of common-law torts, the right to antitrust damages is limited to those plaintiffs who can demonstrate a causal relationship between the defendants' unlawful conduct and their economic injury. See Perkins v. Standard Oil Co. of California, 395 U.S. 642, 648-49, 89 S.Ct. 1871, 1874-1875, 23 L.Ed.2d 599 (1969).[31]
 
 
 102
 Section 16 of the Clayton Act, 15 U.S.C. Sec. 26, provides in pertinent part:
 
 
 103
 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity ....
 
 
 104
 In contrast to section 4, section 16 contains no requirement that a plaintiff prove actual injury to his business or property caused by the antitrust violation. Instead, section 16 authorizes injunctive relief for any person who demonstrates "threatened loss or damage by a violation of the antitrust laws." Thus it is generally said that section 16 imposes a lower threshold "standing" requirement on a plaintiff than does section 4. See, e.g., Bogus v. American Speech & Hearing Ass'n, 582 F.2d 277, 288 (3d Cir.1978); L. Sullivan, Handbook of the Law of Antitrust Sec. 247, at 772 (1977). The courts have applied section 16 "more expansively, both because its language is less restrictive than that of section 4, ... and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy." Bogus, 582 F.2d at 288-89; see Hawaii v. Standard Oil Co. of Calif., 405 U.S. 251, 261-62, 92 S.Ct. 885, 890-891, 31 L.Ed.2d 184 (1972); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969).
 
 
 105
 In Zenith Radio Corp., 395 U.S. at 130, 89 S.Ct. at 1580, the Supreme Court reversed a court of appeals decision setting aside the district court's grant of injunctive relief stating:
 
 
 106
 The evident premise for striking [the injunctive relief] was that Zenith's failure to prove the fact of injury barred injunctive relief as well as treble damages. This was unsound, for Sec. 16 of the Clayton Act, 15 U.S.C. Sec. 26, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of "threatened" injury. That remedy is characteristically available even though the plaintiff has not yet suffered actual injury; ... he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur ....
 
 
 107
 Moreover, the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws .... Section 16 should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice "adjustment and reconciliation between the public interest and private needs as well as between competing private claims." ... Its availability should be "conditioned by the necessities of the public interest which Congress has sought to protect."
 
 
 108
 Zenith, 395 U.S. at 130-131, 89 S.Ct. at 1580 (footnote omitted). See also Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573, 589-94 (3d Cir.1979) (court held that the Illinois Brick direct purchaser rule did not preclude an indirect purchaser from obtaining injunctive relief against price fixing under section 16 of the Clayton Act.)
 
 
 109
 In view of the differences between sections 4 and 16, especially as explicated in Zenith, we conclude that the question whether a defendant has violated sections 1 and/or 2 of the Sherman Act is independent of the question whether each class member must have made a "demand" for staff privileges in order to obtain an injunction and/or treble damages; and that the putative demand requirement is only relevant (if at all) to a plaintiff's right to claim treble damages once a violation has been established. Even if there is no actionable injury in the absence of a D.O.s' demand for hospital privileges (and refusal), there is threatened injury, for the jury found that York hospital and its medical staff had adopted a discriminatory policy towards D.O. applicants for staff privileges, and the court found as a fact that "[t]he denial of hospital staff privileges to a physician ... is a serious adverse professional event which is likely to besmirch the professional reputation of such a physician." Weiss, 548 F.Supp. at 1052 (finding of fact No. 29). In this factual situation, it would be fundamentally inconsistent with section 16's stated purpose of providing relief against "threatened loss " to require that each member of the plaintiff class have made a demand for staff privileges as a prerequisite to obtaining injunctive relief. A contrary conclusion would result in a rule requiring the class to suffer actual harm (besmirching of their professional reputations resulting from denial of their applications) caused by the defendants' antitrust violations in order to qualify for injunctive relief against threatened harm from the same violations. That result is unacceptable.[32]
 
 
 110
 We therefore hold that where the plaintiff class is a (b)(2) class--i.e., one that seeks primarily injunctive relief--a demand by each member of the class is not a prerequisite to injunctive relief, at least where the plaintiffs have established that the denial of a physician's application for staff privileges is injurious to the physician's professional reputation.
 
 2. The Requirements of Fed.R.Civ.P. 23
 
 111
 As we noted above, the district court, pursuant to Fed.R.Civ.P. 23, certified Weiss as the representative of the class of all osteopathic physicians in the York MSA. The defendants challenge that certification on two grounds: first that the plaintiff and plaintiff class do not satisfy the four threshold requirements for class action certification contained in Rule 23(a), and second that the district court improperly certified the plaintiff class as (b)(2) class. We address these contentions in turn.
 
 
 112
 a. Rule 23(a)
 
 
 113
 Fed.R.Civ.P. 23(a) contains the threshold requirements for the maintenance of any type of class action. The Rule provides:
 
 
 114
 (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 115
 For the reasons that follow, we conclude that the plaintiff class in this case satisfied the four requirements of Rule 23(a).[33]
 
 
 116
 (i) Numerosity
 
 
 117
 The first requirement is that the class must be so numerous that joinder of all members is impracticable. The defendants argue that because there are approximately 92 members in the class, all class members live and work in the York MSA, and all class members can be identified with "minimal effort" and joined in this action with "minimal inconvenience,"[34] the numerosity requirement has not been satisfied. The district court gave two reasons for reaching the contrary conclusion. First, the court noted that the primary relief sought by plaintiffs was injunctive, and stated that in such cases a "strict application (requiring the class to consist of hundreds or more persons) of the numerosity requirement is unwarranted." Weiss v. York County Hospital, Civ. No. 80-0134, at 9-10 & 19 (M.D.Pa. filed 3/28/81) [App. at 1513a-1514a, 1523a], citing Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270, 276 (10th Cir.1977) (class of 46 employees of defendant satisfies numerosity requirement where primary relief sought is injunctive) and Jones v. Diamond, 519 F.2d 1090, 1100 (5th Cir.1975) (class of 48 prisoners seeking injunctive relief upheld). Second, the district court concluded that the "individual interest in controlling this litigation is minimal." We agree with the district court that the numerosity requirement is satisfied in this case.
 
 
 118
 In most cases where a plaintiff seeks injunctive relief against discriminatory practices by a defendant, the defendant will not be prejudiced if the plaintiff proceeds on a class action basis, as opposed to an individual basis, because the requested relief generally will benefit not only the claimant but all other persons subject to the practice under attack. 7 C. Wright & A. Miller, Federal Practice & Procedure Sec. 1771, at 663-64 (1972). A judicial determination that a particular practice infringes upon protected rights and is therefore invalid will prevent its application by the defendant against many persons not before the court. Thus rigorous application of the numerosity requirement would not, as the district court noted, appear to be warranted. Also supporting this view is the fact that, as this case demonstrates, and as the district court observed, generally speaking, individual interest in pursuing litigation where the relief sought is primarily injunctive will be minimal. Id. Weiss demonstrated an obvious commitment vigorously to pursue the antitrust claim against the defendants. This commitment apparently did not escape the other D.O.s in the York MSA because no D.O. sought to intervene in the lawsuit or otherwise challenge Weiss' leadership.
 
 
 119
 Given our conclusion that the interests of the plaintiff class and the interests of the defendants will not be affected significantly by permitting Weiss to maintain this class action, we agree with the district court that a strict application of the numerosity requirement is not required here. Consequently, the district court did not abuse its discretion in concluding that the class of 92 D.O.s who work in the York MSA was sufficiently numerous to satisfy the requirements of Rule 23(a)(1). Of course, 92 class members might be enough in any event.[35]
 
 
 120
 (ii) Commonality
 
 
 121
 Rule 23(a)(2) requires that there be questions of law or fact common to the class, although not all questions of law or fact raised need be in common. 7 C. Wright & A. Miller, Federal Practice & Procedure Sec. 1763, at 603 (1972). The district court concluded that all class members were in a "substantially identical factual situation" and that the "questions of law raised by the plaintiff are applicable to each [class] member." While we concede that some questions have been raised with respect to Dr. Weiss that might not be raised with respect to other members of the class, i.e. the allegations of lack of professional competence and conduct, common questions by far predominate especially with respect to the claim for injunctive relief, hence we conclude that the second requirement of Rule 23(a) has been met. This case will have to be remanded for trial of the competence and conduct defenses of such damage claims as Weiss and members of the class may assert. There is no inconsistency between class certification, particularly (b)(2) class certification, and the individual trial of damage claims which may present disparate issues. See Halderman v. Pennhurst State School & Hospital, 612 F.2d 84 (3d Cir.1979).
 
 
 122
 (iii) Typicality
 
 
 123
 Defendants also argue that Weiss' claims are not typical of the class. Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class. The meaning of this requirement has historically been somewhat elusive.[36] However, Weiss' claims are plainly "typical" of the claims of the class whichever of the several approaches to the meaning of this term is used. The essential legal claim of all the plaintiffs, including Weiss, is that they are osteopathic physicians who can not obtain staff privileges at York because of a scheme by the M.D.s who control admissions at York to exclude them in violation of the antitrust laws. In addition the factual matrix that suggests this legal claim is the same for all the plaintiffs, again including Weiss.
 
 
 124
 Defendants argue that General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) requires the conclusion that plaintiffs' claims are atypical of the class' claims:
 
 
 125
 There are obviously two disparate groups subsumed in the class certified below: the osteopathic physicians who have not applied for staff privileges, allegedly dissuaded by fear, and the one applicant who applied and was rejected. ... [under Falcon ], Weiss could not be the class representative for the former group, and the two groups could not be encompassed in the same class.
 
 
 126
 Defendants' Brief at 26. This argument fails for two reasons. First, the Supreme Court in Falcon did not hold that the plaintiff could not represent the class; the Court merely held that the requirements of Rule 23(a) are not waivable in a Title VII case, and therefore that the plaintiff had to make the required presentation demonstrating that he satisfied the requirements of that rule.[37] Weiss made the required presentation in this case and the district court found that the class was sufficiently numerous, that there was a commonality of issues, that the plaintiff's claims were typical of the class' claims, and that the plaintiff would adequately represent the class' interests. Therefore, Falcon is inapposite. Second, defendant's dichotomy between those who have applied and been rejected and those who are afraid to apply is not enough to carry the day, for, in essence, there is only one class advanced in this case--the osteopathic physicians in the York MSA who are the intended victims of York's discriminatory admissions policy. Thus, as we have stated, the typicality requirement is met in this case.
 
 
 127
 (iv) Adequacy of Representation
 
 
 128
 The fourth and final part of the Rule 23(a) test requires that the plaintiff must adequately represent the interests of the class.
 
 
 129
 Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.
 
 
 130
 Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239, 247 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). The quality and experience of plaintiff's counsel is conceded by the defendants. In addition, Weiss testified before the district court that he was willing and able (both financially and otherwise) to pursue this litigation, and that he could perceive no conflict of interest between himself and any class member. The district court concluded that Weiss would fairly and adequately represent the class. We agree and therefore conclude that the requirements of subsection (a)(4) have also been satisfied.
 
 
 131
 b. Rule 23(b)(2)
 
 
 132
 The defendants also challenge the propriety of the district court's certification of a (b)(2) plaintiff class;[38] however, their objections are based on the failure of class members to have made a demand for staff privileges at York and on their contention that the requirements of Rule 23(a) have not been met. Since we have already decided both these contentions adversely to the defendants, we simply note that the class in this case is a classic (b)(2) class in that the defendants have "acted or refused to act on grounds generally applicable to the class" and the primary relief sought is an injunction against future discrimination. When a suit seeks to define the relationship between the defendant(s) and the world at large, as in this case, (b)(2) certification is appropriate. Thus we affirm the district court's class certification decision.
 
 
 133
 D. The Vicinage Requirement Of 28 U.S.C. Sec. 1393(a)
 
 
 134
 The final preliminary issue is the defendants' contention that the district court erred in holding the trial in this case at the Lewisburg/Williamsport courthouse rather than the Harrisburg courthouse.[39] The defendants contend that they had a statutory right pursuant to 28 U.S.C. Sec. 1393(a) to be tried in Harrisburg. Section 1393(a) provides:
 
 
 135
 (a) Except as otherwise provided, any civil action, not of a local nature, against a single defendant in a district containing more than one division must be brought in the division where he resides.
 
 
 136
 Unlike numerous districts, the Middle District of Pennsylvania has not been subdivided by Congress into divisions. The Middle District has, however, been divided into a number of subdivisions by local court rule. All the defendants in this case reside in the Harrisburg subdivision, and they contend that section 1393(a) gives them the right to be tried there,[40] and that the district court erred when it held the trial of this action in the Lewisburg/Williamsport division over their objection.[41]
 
 
 137
 Section 1393(a) does provide that a defendant must be tried in the division of the district court wherein he resides; however, the statute only applies where the "divisions" have been created by legislative action. See Jenner v. Murray, 32 F.2d 625 (5th Cir.1929) (construing predecessor statute to present section 1393); Patrick Jobbing Co. v. Globe & Rutgers Fire Ins. Co., 21 F.2d 106 (W.D.Va.1927) (same). The Harrisburg division involved in this case was created by court rule not by legislative action. A federal rule of civil procedure promulgated by the Supreme Court cannot and does not affect venue. 1 J. Moore, Moore's Federal Practice p 0.143, at 1464 (2d ed. 1984). A fortiori a local district court rule is similarly limited. See id. Because the Middle District of Pennsylvania has no legislatively created divisions, see 28 U.S.C. Sec. 118, section 1393's venue provisions are irrelevant to trials conducted there, and the defendants' vicinage claim must be rejected.[42]
 
 IV. THE SHERMAN ACT CLAIMS
 
 138
 We now turn to the substantive-law questions presented by this appeal. In part A of this section, we deal with the appeal from the district court's conclusion that the medical staff is liable to the class under section 1 of the Sherman Act; in part B, we discuss the hospital's appeal from the finding of liability against it under section 2 of the Sherman Act; and in part C, we review the propriety of the injunction issued against both the medical staff and the hospital.
 
 A. Section 1 of the Sherman Act
 
 139
 In order to establish a violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1 (1982), a plaintiff must establish three elements: (1) a contract, combination, or conspiracy; (2) restraint of trade; and (3) an effect on interstate commerce. Each of these three elements has been the subject of extensive analysis by the courts, and we now turn to a discussion of that caselaw and its application to the facts of this case, taking the elements up in turn.
 
 
 140
 1. Proof of an Agreement: Is There a Sufficient Number of Conspirators?
 
 
 141
 In order to establish a violation of section 1, a plaintiff must prove that two or more distinct entities agreed to take action against the plaintiff. Before the district court, Weiss contended that the hospital and its medical staff were legally distinct entities and therefore capable of conspiring in violation of section 1. He also asserted that the doctors who joined together to form the medical staff were separate economic entities who competed against each other so that, as a matter of law, the medical staff was a "combination" of doctors within the meaning of section 1. Finally, Weiss argued that even if the individual doctors who made up York's medical staff were deemed by the court to be the equivalent of "officers or employees" of the hospital and therefore ordinarily not capable of conspiring with the hospital, nevertheless the doctors were acting for their own benefit in discriminating against osteopaths, and therefore fell within an exception to the ordinary rule that "officers or employees of the same firm do not provide the plurality of actors imperative for a Sec. 1 conspiracy." Copperweld Corp. v. Independence Tube Corp., --- U.S. ----, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984).[43]
 
 
 142
 The defendants countered that York and its medical staff were legally one entity and therefore incapable of conspiring. In addition the defendants asserted that the individual doctors who made up the medical staff were the equivalent of "employees or officers" of the hospital and hence legally incapable of conspiring with the hospital. Finally the defendants asserted that they had not discriminated against osteopaths and therefore that the putative exception to the general rule did not apply in this case.
 
 
 143
 The district court concluded, and instructed the jury, that the medical staff was an "unincorporated division" of the hospital, and as such the two were legally a "single entity" incapable of conspiring. In addition, the court instructed the jury that the hospital, as a corporation, could act only through its "officers and agents," and that in proving that York had so acted, the plaintiffs had not shown the existence of a "contract, combination ... or conspiracy."[44] The court also instructed the jury, however, that if they found that some or all of the individual defendants took action against the plaintiffs "in whole or in part in their individual capacities and motivated in whole or part by independent personal economic interests, then such individual-named defendants are, under the law, independent economic entities ... [and therefore are] legally capable of conspiring with York Hospital or its Medical and Dental Staff." App. at 5686a.
 
 
 144
 In response to these instructions, the jury answered the following special verdict question in the affirmative:
 
 
 145
 11. Did any of the Defendants conspire with any other person or persons, entity or entities, whether or not a Defendant, to deny or impede reasonable, fair, equal or full access to staff privileges at York Hospital by osteopathic physicians other than Plaintiff Weiss?
 
 
 146
 App. at 6247a. However, when requested by special verdict question number 13 to check the names of the defendants who so conspired, the jury checked only the single name: "York Hospital Medical and Dental Staff."[45] On the basis of these answers, the district court held the defendant medical staff liable to the plaintiff class under section 1. On the question who conspired with the medical staff, the court stated only:
 
 
 147
 The York Hospital Medical and Dental Staff conspired with another person or entity to deny or impede reasonable, fair, equal, and full access to staff privileges at York Hospital by osteopathic physicians other than Plaintiff Weiss.
 
 
 148
 Weiss, 548 F.Supp. at 1051 (finding of fact No. 8).[46]
 
 
 149
 The defendants appeal the district court's finding that there was a "conspiracy." They note that all the individual defendants and the hospital itself were exonerated from liability under section 1, and that because "there is no evidence in the record identifying any possible 'co-conspirator' " other than the individual defendants and the hospital, the finding that the medical staff engaged in a "conspiracy" is erroneous.[47] The plaintiffs cross-appeal arguing that the district court's jury instruction concerning the capacity of the medical staff to conspire with itself and with York Hospital was erroneous.
 
 
 150
 We agree with the plaintiffs that, as a matter of law, the medical staff is a combination of individual doctors and therefore that any action taken by the medical staff satisfies the "contract, combination, or conspiracy" requirement of section 1. Any error created by the district court's jury charge on the requirements for a "conspiracy," however, was harmless because the jury found that a conspiracy did exist. In addition, because the medical staff itself is a combination as a matter of law, we conclude that the absence of evidence of any other co-conspirator(s) is irrelevant. We do, however, agree with the district court that the hospital cannot legally conspire with its medical staff.
 
 
 151
 Antitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form. Copperweld Corp. v. Independence Tube Corp., --- U.S. ----, 104 S.Ct. 2731, 2738, 2739-40, 2744, 81 L.Ed.2d 628 (1984); United States v. Sealy, Inc., 388 U.S. 350, 353, 87 S.Ct. 1847, 1850, 18 L.Ed.2d 1238 (1967); United States v. Yellow Cab Co., 332 U.S. 218, 227-228, 67 S.Ct. 1560, 1565-1566, 91 L.Ed. 2010 (1947); Appalachian Coals, Inc. v. United States, 288 U.S. 344, 360-61, 376-77, 53 S.Ct. 471, 474-475, 480, 77 L.Ed. 825 (1933).[48] The "substance" of an arrangement often depends on the economic incentive of the parties. The York medical staff is a group of doctors, all of whom practice medicine in their individual capacities, and each of whom is an independent economic entity in competition with other doctors in the York medical community. Each staff member, therefore, has an economic interest separate from and in many cases in competition with the interests of other medical staff members. Under these circumstances, the medical staff cannot be considered a single economic entity for purposes of antitrust analysis.
 
 
 152
 In the past, the Supreme Court has had occasion to address the problems created by cooperative ventures among otherwise competing entities in a single market. See Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). Both the AP and NYSE are organizations which serve an economically useful purpose: the AP allows smaller newspapers to combine their resources for the purpose of collecting, assembling, and distributing news; NYSE provides an organized market for the purchase and sale of securities. Yet in both cases, the fact that the defendant organization was a combination of otherwise competing entities was deemed sufficient to satisfy the "contract, combination, ... or conspiracy" requirement of section 1.[49]
 
 
 153
 Two recent Supreme Court cases reaffirm that a single entity made up of independent, competing economic entities satisfies the joint action requirement of Sherman Act section 1. In Arizona v. Maricopa County Medical Society, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the defendants, the Maricopa Foundation for Medical Care and the Pima Foundation for Medical Care, were non-profit Arizona corporations composed of licensed doctors of medicine, osteopathy, and podiatry engaged in private practice. The Foundations were "organized for the purpose of promoting fee-for-service medicine and to provide the community with a competitive alternative to existing health insurance plans." Id. at 339, 102 S.Ct. at 2470. The Court simply assumed without discussion that the actions of each foundation satisfied the "contract combination ... or conspiracy" element of section 1. Similarly, in National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), the defendant, an association of professional engineers organized to deal with "the nontechnical aspects of engineering practice," id. at 682, 98 S.Ct. at 1360, had adopted an ethics canon prohibiting competitive bidding. Once again the Court simply assumed, without discussion, that the defendant was a combination of its members. See also Virginia Academy of Clinical Psychologists v. Blue Shield of Va., 624 F.2d 476, 479-481 (4th Cir.1980), cert. denied, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981) (Blue Shield of Virginia deemed an agent under the direction and control of its member physicians, and therefore its actions were that of a "combination" for section 1 purposes).
 
 
 154
 On the basis of these cases, we believe that the actions of the York medical staff are the actions of a combination of the individual doctors who make it up. In substance, the medical staff is a group of individual doctors in competition with each other and with other physicians in the York MSA, who have organized to regulate the provision of medical care at York hospital. Where such associations exist, their actions are subject to scrutiny under section 1 of the Sherman Act in order to insure that their members do not abuse otherwise legitimate organizations to secure an unfair advantage over their competitors.
 
 
 155
 The foregoing summary does not, however, end our discussion on this point, for we must consider whether errors in the district court's charge harmed any of the parties. The district court instructed the jury that "York Hospital and the Medical and Dental Staff of York Hospital must be regarded by you as a matter of law as a single entity which cannot conspire with itself." App. at 5685a. To the extent that this instruction indicates that the medical staff must be considered a single entity for antitrust purposes, it is at variance with our holding that the medical staff is a combination of the individual doctors who make it up. The plaintiffs, however, were not harmed by this error. In answer to the special verdict questions propounded by the trial judge the jury found that a conspiracy did exist, but that the medical staff was the only defendant that participated. See supra note 45 and accompanying text. Since the legal result of this finding is identical to that of our conclusion that the medical staff is a "combination," the district court's error was harmless.[50]
 
 
 156
 Finally, we deal with the plaintiff's assertion that the district court erred in charging the jury that the hospital could not conspire with its medical staff. The district court found that the medical staff was an unincorporated division of the hospital, and as such the court determined that the two could not conspire. Although we do not necessarily agree with the district court's characterization of the medical staff as an unincorporated division of the hospital, we agree with its basic conclusion that, with respect to the issues in this case, the hospital could not, as a matter of law, conspire with the medical staff. The medical staff was empowered to make staff privilege decisions on behalf of the hospital. As such, with regard to these decisions, the medical staff operated as an officer of a corporation would in relation to the corporation. Although the members of the medical staff had independent economic interests in competition with each other, the staff as an entity had no interest in competition with the hospital. Accordingly, we conclude that the district court correctly charged the jury that there could not be a conspiracy between the hospital and the medical staff. But see Antitrust and Hospital Privileges, supra note 4, at 639-40.[51]
 
 2. Proof of Restraint of Trade
 
 157
 a. Introduction
 
 
 158
 Read literally, Section 1 prohibits every agreement "in restraint of trade." In United States v. Joint Traffic Ass'n, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898), the Supreme Court recognized that Congress could not have intended a literal interpretation of the word "every," and since Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), courts have analyzed most restraints under the so-called "rule of reason." As its name suggests, the rule of reason requires the factfinder to decide whether, under all the circumstances of the case, the restrictive practice imposes an unreasonable restraint on competition.[52]
 
 
 159
 The courts have also, however, applied a rule of per se illegality to certain types of business practices. The development of per se rules has resulted from a recognition that the case-by-case approach inherent in the rule of reason has significant costs,[53] and that certain types of business practices almost always have anticompetitive effects without offsetting pro-competitive effects. In applying the per se rules, a court eschews the ordinary evaluation of the effect of the challenged practice, and concentrates instead on the question whether the practice falls within one of the categories of practices condemned by the per se rule. In this case, the plaintiffs argued that the actions of the defendants were the equivalent of a boycott, or as it is sometimes called, a concerted refusal to deal, and thus illegal per se.[54] We now turn to that inquiry.
 
 
 160
 b. Is Defendants' Exclusionary Conduct the Equivalent of a Concerted Refusal to Deal ("Boycott")?
 
 
 161
 The jury found that the defendants had engaged in a policy of discrimination against Dr. Weiss and the other D.O.s in the York MSA by applying unfair, unequal, and unreasonable procedures in reviewing their applications. Weiss, 548 F.Supp. at 1051 (findings of fact Nos. 5-8). In addition, the district court concluded that this unfair, unreasonable, and unequal treatment "could reasonably be anticipated [by the defendants] to cause osteopathic physicians to refrain from applying for staff privileges at the York Hospital." Weiss, 548 F.Supp. at 1053 (finding of fact No. 31).[55] The question before us is whether these actions should properly be characterized as a "group boycott" or "concerted refusal to deal,"[56] in which case they are illegal per se under section 1. See United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Fashion Originators' Guild of America v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). If the defendants' actions cannot be so characterized, the rule of reason analysis would apply and the outcome of the case could be different. But see infra note 61. We conclude that the defendants' actions, as found in the district court, are the equivalent of a concerted refusal to deal.
 
 
 162
 The classic example of a concerted refusal to deal is the situation in which businesses at one level of production or distribution, e.g., retailers, use the threat of a boycott to induce businesses at another level, e.g., manufacturers, not to deal with competitors of the retailers. As Professor Sullivan has observed, "The boycotting group members, in effect, say to their suppliers or to their customers, 'If you don't stop dealing with non-group members, we will stop dealing with you.' If continued trade with group members is more important to a supplier or customer than is trading with non-group members, this threat will be effective." L. Sullivan, Handbook of the Law of Antitrust Sec. 83, at 230 (1977).[57]
 
 
 163
 In this case York is a provider of hospital services; for the purpose of our analysis, the equivalent of the manufacturer in the example of a classical boycott. Similarly, the M.D.s are the equivalent of the retailers in the example, in the sense that physicians require access to a hospital in order to effectively treat patients. The difficulty with this analogy, at first blush, is that there is no evidence that the M.D.s have used coercion for the purpose of inducing York to exclude their competitors, the D.O.s. Upon closer analysis, however, the absence of coercion is irrelevant. A boycott is not illegal under the antitrust laws because of opposition to the use of coercion, but because it involves the use by businesses of an existing relationship with a supplier to exclude competition. In the paradigm case, coercion is necessary to induce the supplier not to deal with the competitors. In this case, because of the M.D.s' control over York's admission decisions, no coercion is necessary. The underlying antitrust violation is the same: a group of firms at one level of distribution, i.e., the doctors' level, have used their existing relationship with a supplier to exclude their competitors from dealing with the supplier.[58]
 
 
 164
 We recognize that the facts of this case do not precisely fit into the mold of the classical refusal to deal. The refusal to deal is less than total insofar as York admitted Dr. Zittle and a number of other osteopaths. See supra note 13 and infra note 76. Arguably then, what is at issue is not a boycott but mere discrimination, which sounds less like a per se antitrust violation. However, given the evidence of the different standards applied to osteopaths and M.D.s and the second class citizenship afforded D.O.s upon admission to staff privileges at York, and in view of the adverse impact of these factors upon D.O. applications for York staff privileges, we are satisfied that the restrictive policy is, in purpose and effect, sufficiently close to the traditional boycott, that the characterization is appropriate.
 
 
 165
 The Medical Staff is, however, entitled to exclude individual doctors, including osteopaths, on the basis of their lack of professional competence or unprofessional conduct. See infra note 60. If York's policy toward D.O.'s could be viewed as a form of industry self-regulation of this type, the rule of reason, rather than a per se rule, would be applicable. See generally L. Sullivan, Handbook of the Law of Antitrust Secs. 86-88 (1977).[59] We recognize, therefore, that in many cases involving exclusion from staff privilege, courts will, more or less openly, have to utilize a rule of reason balancing approach. This case is different, however, because York has not contended that osteopaths as a group are less qualified than M.D.s. See supra note 4. In the absence of such a contention, or another legitimate explanation for the discrimination, we conclude that a per se rule should be applied, since the effect of the practice is identical to that of the traditional boycott, and plainly anticompetitive.
 
 
 166
 Congruent with the foregoing discussion, the Supreme Court has adopted an exception to application of the per se rule of illegality where the case involves a learned profession and where the restriction is justified on "public service or ethical norm" grounds. Thus unlike most cases where characterization of some activity as a classical boycott ends the inquiry, here, because the medical profession is involved, the rule of reason analysis may still control, as a "built-in" exception. We now turn to a discussion of this potential "escape hatch" to see if it can extricate the defendants from the "cut" of the per se rule.
 
 
 167
 c. The "Learned Profession" Exception
 
 
 168
 In Goldfarb v. Virginia State Bar, 421 U.S. 773, 788 n. 17, 95 S.Ct. 2004, 2013 n. 17, 44 L.Ed.2d 572 (1975), in which the Supreme Court made clear that the medical profession is not exempt from the antitrust laws, the Court stated that the "public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." See also National Society of Professional Engineers v. United States, 435 U.S. 679, 696, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978). In Arizona v. Maricopa County Medical Society, 457 U.S. 332, 348-49, 102 S.Ct. 2466, 2475-2476, 73 L.Ed.2d 48 (1982), the Court partially explained this exception by stating that conduct which is normally subject to per se condemnation under section 1 will instead be subject to rule of reason analysis where the challenged conduct is "premised on public service or ethical norms." Id.[60] In Maricopa, because the defendants did not attempt to justify their price fixing arrangements on either of these grounds, but instead attempted to argue that the maximum price levels were pro-competitive, the Court held that the per se rule controlled and consequently found that the defendants' conduct violated section 1.
 
 
 169
 In this case the defendants have offered no "public service or ethical norm" rationale for their discriminatory treatment of D.O.s. Indeed, their defense at trial was that they did not discriminate against D.O.s. Since the jury believed otherwise, we conclude that the per se rule governs this case,[61] except to the extent that the defendants may defend as to the damage claims of Weiss or any class member on grounds of lack of professional capacity or unprofessional conduct.
 
 
 170
 d. The District Court's Charge and the Sherman Act Section 1 Verdict as to Weiss
 
 
 171
 As we have explained, the case was submitted to the jury on special interrogatories, and, based thereon, the district court made certain findings and granted injunctive relief. Because of our rulings on appealability, see supra Part III B, we ultimately review here, in terms of the plaintiffs' section 1 claims, only the injunctive order. We conclude that a per se analysis, coupled with the district court's findings, provide the substantive basis for the issuance of an injunction under section 1 of the Sherman Act in favor of the class and that, as a matter of law, there is no grounds for distinguishing Weiss and the class under section 1 for purposes of injunctive relief. The district court entered an injunction in favor of both Weiss and the class, but held that Weiss was entitled to relief under section two. Although we reverse that holding, see infra part IV.B., we conclude that Weiss was entitled to injunctive relief under section 1.
 
 
 172
 The question of whether Weiss or any class member is entitled to damages, however, is in no way settled by our conclusion. In the trial on the question of damages, the defendants may raise the defenses relating to individual osteopaths, including the demand requirement defense as to members of the class, see supra notes 30, 32, and the defense of lack of professional competence or character as to both Weiss and the class. This is so even though, as we have explained, no such defense has been interposed as to osteopaths generally, thus facilitating our disposition of the injunctive relief claim under section 16. See supra at Part III C 1.
 
 
 173
 We must also address the question whether the professional competence and character issue has already been resolved by the jury's verdict with regard to Weiss. This requires a consideration of the relevant portion of the district court's charge. The court charged that a combination rule-of-reason/per-se analysis applied to defendants' conduct:
 
 
 174
 Among the practices which the courts have deemed to be unlawful in and of themselves--that is the per se quality--are group boycotts or concerted refusals to deal.
 
 
 175
 In this case it is alleged that the York Hospital and members of its Medical Staff have conspired to exclude osteopathic physicians from the staff of the hospital or obtaining access to the staff. This would be a refusal to deal, per se and unreasonable restraint of trade.
 
 
 176
 If you find that the Defendants while acting in concert acted to exclude osteopathic physicians from the medical staff of York Hospital or treated osteopathic physicians in a way different from allopathic physicians, or acted unreasonably with the purpose or effect of excluding osteopathic physicians from the staff of York Hospital, I then instruct you that such conduct would be an unreasonable restraint of trade as a matter of law.
 
 
 177
 ....
 
 
 178
 In determining whether or not a per se unreasonable conspiracy existed among any of the defendants as co-conspirators to refuse to deal with the Plaintiff Weiss, or the Plaintiff class, you may consider the validity of the reasons which such parties have given for any refusal to deal with the Plaintiff or the Plaintiff class.
 
 
 179
 ....
 
 
 180
 Even if you do not find the defendants' behavior to be per se an unreasonable restraint of trade, you may still find that under all the circumstances the defendants' conduct was an unreasonable restraint of trade.
 
 
 181
 App. at 5690a-5695a. Apparently applying this instruction, the jury concluded that the defendants' conduct constituted an "unreasonable restraint" as to the class, but was not an "unreasonable restraint" as to Weiss. Weiss, 548 F.Supp. at 1051-52 (findings of fact Nos. 7 & 9). Based on these answers, the district court concluded that the medical staff was liable for violating Sherman Act section 1 as to the class but not as to Weiss.
 
 
 182
 This conclusion is flawed, however, because the instruction was either incorrect or misleading. The instruction was incorrect to the extent that the defendants' conduct in discriminating against D.O.s as a class is subject to the per se rule of illegality, hence it was irrelevant whether the defendants' conduct was an unreasonable restraint as to Weiss (or the class). In that respect the question should not have been submitted to the jury. See Jefferson Parish Hosp. Dist. No. 2 v. Hyde, --- U.S. ----, 104 S.Ct. 1551, 1556, 80 L.Ed.2d 2 (1984); Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49-50, 97 S.Ct. 2549, 2557-2558, 53 L.Ed.2d 568 (1977). To the extent that the charge posed to the jury the question whether it was not unreasonable to deny Weiss admission because he lacked professional competence or character, it was confusing, because the court did not properly define the relationship between the per se rule for concerted refusals to deal and the learned profession exception. The question of Weiss' professional competence or character, however, was neither properly nor squarely presented to the jury. The district court did not reach any conclusion arguably based on that question.[62] Because of the confusion in the court's charge, and the lack of a specific special interrogatory to the jury, we cannot deem the issue of Weiss' professional competence and character as a defense to his claim for damages concluded. Hence, to the extent that the question was arguably resolved by the jury, we grant a partial new trial on that issue. In all other respects Weiss is entitled to the benefit of the district court's findings under section 1.
 
 
 183
 3. Substantiality of Effect on Interstate Commerce
 
 
 184
 In order to violate section 1 of the Sherman Act, a defendant's actions must relate to trade or commerce "among the several States."[63] There are two ways to satisfy this requirement: the proscribed conduct may itself be "in interstate commerce," or the conduct may be a purely intrastate activity that has a "substantial and adverse effect" on interstate commerce.[64] See, e.g., McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980); Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 743, 96 S.Ct. 1848, 1851, 48 L.Ed.2d 338 (1976); Cardio-Medical Associates v. Crozer-Chester Medical Center, 721 F.2d 68, 71 (3d Cir.1983).
 
 
 185
 The district court focused its evidentiary inquiry on the effect on interstate commerce of the defendants' conduct and found the requisite "substantial and adverse" effect.[65] Both before the district court and on appeal the defendants have contended that the proper focus should have been whether the defendants' allegedly illegal conduct substantially affected the plaintiffs' activities in interstate commerce. The defendants concede that, if the district court was correct in focusing the inquiry on the effect of the defendants' activities, the evidence supports the jury's and court's conclusion that the effect on interstate commerce was "substantial and adverse."
 
 
 186
 The defendants' argument is premised primarily on a district court opinion, Cardio-Medical Associates v. Crozer-Chester Medical Center, 552 F.Supp. 1170 (E.D.Pa.1982). Since the time of oral argument in this case, however, this court reversed that district court's opinion and held that:
 
 
 187
 We therefore decline to adopt the district court's theory that defendants' conduct is relevant to the jurisdictional inquiry only insofar as it affects interstate commerce through the person of the plaintiff .... [W]e are willing to examine the defendants' conduct both as it affects interstate commerce through the person of the plaintiff and as it affects commerce independently.
 
 
 188
 Cardio-Medical Assocs. Ltd. v. Crozer-Chester Med. Ctr., 721 F.2d 68, 75 (3d Cir.1983). Consequently, the district court was correct in focusing on the effect on interstate commerce of the defendants' activities.[66] We therefore affirm the finding of a "substantial and adverse" impact on interstate commerce in this case.
 
 B. Section 2 of the Sherman Act
 Section 2 reads in pertinent part:
 
 189
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor....
 
 
 190
 15 U.S.C. Sec. 2. The test for determining whether a defendant has monopolized in violation of section 2 has been articulated by the Supreme Court as: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-571, 86 S.Ct. 1698, 1703-1704, 16 L.Ed.2d 778 (1966). See also Borough of Lansdale v. Philadelphia Electric Co., 692 F.2d 307, 311 (3d Cir.1982).[67] The district court found the defendant York liable to both Weiss and the plaintiff class for unlawful monopolization in violation of section 2. York has appealed that finding.
 
 
 191
 York contends that the jury incorrectly concluded that the appropriate market was inpatient health care services provided by hospitals and their staffs; that it incorrectly concluded that York had monopoly power in that market; and that it incorrectly concluded that York acquired or maintained that power by means of "willful" conduct. We conclude that, although there was sufficient evidence to support the jury's conclusion as to relevant market and monopoly power, there was no evidence of willful conduct designed to acquire or maintain monopoly power, and therefore the judgment against York under section 2 must be reversed.
 
 
 192
 (1) Relevant Market
 
 
 193
 In order to define the relevant market for purposes of a section 2 claim, it is necessary to examine two aspects of that market: the product market and geographic market. York does not challenge the jury's finding that the relevant geographic market is the York MSA. York does, however, challenge the jury's finding on the product market. In answer to special verdict question number 14, the jury found that the relevant product market was "inpatient hospital health care services supplied by hospitals and their medical staffs." Weiss, 548 F.Supp. at 1052 (finding of fact No. 10). Market definition is a question of fact, Borough of Lansdale, 692 F.2d at 311-12, and we therefore must affirm the jury's conclusion unless the record is devoid of evidence upon which the jury might reasonably base its conclusion. See Dawson v. Chrysler Corp., 630 F.2d 950, 959 (3d Cir.1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp., 579 F.2d 20, 28 (3d Cir.), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); Denneny v. Siegel, 407 F.2d 433, 439 (3d Cir.1969).
 
 
 194
 Recognizing their substantial burden in overturning a jury's factual finding, York argues that, as a matter of law, the product market is the narrowest market that includes all competing products that consumers perceive as reasonable substitutes for each other.[68] Defendants' Brief at 40. York contends that, since the plaintiff's expert did not support his conclusion that the relevant market was inpatient hospital care with "any study or evidence of any kind that patients perceive all health care to be essentially fungible," and since it is obvious that inpatient hospital services are not fungible, the jury's finding that the relevant product market is inpatient health care is incorrect as a matter of law. Id. at 41.
 
 
 195
 In defining a market in an antitrust case, the fact finder must take into account the realities of competition. See United States v. Grinnell Corp., 384 U.S. 563, 572-73, 86 S.Ct. 1698, 1704-1705, 16 L.Ed.2d 778 (1966); United States v. Philadelphia National Bank, 374 U.S. 321, 356-57, 83 S.Ct. 1715, 1737-1738, 10 L.Ed.2d 915 (1963); see also Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Since the purpose of market definition is to determine whether market power exists, see L. Sullivan, Handbook of the Law of Antitrust Sec. 12 (1977), market definitions must account for all factors affecting the ability of the alleged monopolist to raise prices or restrict competition, but need not account for other factors which might affect an economist's definition of a product market.
 
 
 196
 Defendants argue that "inpatient health care services" is not a single market, but an amalgam of numerous markets for individual types of services. Where, however, several goods or services are generally offered by the same providers, it is not unreasonable for a jury to conclude that the market for antitrust purposes includes all of those goods or services. See Grinnell Corp., 384 U.S. at 572, 86 S.Ct. at 1704;[69] Philadelphia National Bank, 374 U.S. at 363, 83 S.Ct. at 1741. In this case, the medical staffs. App. at 3851a. The defendants' expert also testified that a patient may require several different types of services during his stay at a hospital depending on the course of his treatment. App. at 5136a-37a. The jury could reasonably have concluded based on this testimony that a consumer of hospital services makes one "purchase decision"--where to be hospitalized--and that further decisions concerning his treatment are relatively insulated from any competitive effect.[70] This conclusion was clearly supported by the evidence, and therefore we affirm the jury's finding that the relevant product market was inpatient hospital health care. See Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).
 
 
 197
 (2) Monopoly Power.
 
 
 198
 Monopoly power is defined as the ability to control price in or to exclude or restrict competition from a relevant geographic market. United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956); Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp., 579 F.2d 20, 26 (3d Cir.1978), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).[71] In their answers to special verdict questions numbers 16 and 18, the jury expressly determined that York had such power. On appeal York asserts that there was insufficient evidence to support the jury's conclusion on this point. We find this contention to be without merit.
 
 
 199
 A primary criterion used to assess the existence of monopoly power is the defendant's market share. See L. Sullivan, Handbook of the Law of Antitrust Sec. 22 (1977).[72] In this case, the plaintiffs' expert testified that York possessed a market share in excess of eighty percent, and that in his expert opinion the defendants possessed "the power to exclude competition" and "the power to raise and control prices." App. at 3861a. Since monopoly power is a question of fact, Borough of Lansdale v. Philadelphia Electric Co., 692 F.2d 307, 311 (3d Cir.1982), and since we believe that the expert's testimony and York's market share is sufficient evidence upon which the jury could reasonably have concluded that monopoly power existed in this case, we affirm the jury's and district court's finding on this point. See Dawson v. Chrysler Corp., 630 F.2d 950, 959 (3d Cir.1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981).
 
 
 200
 3. Willful Acquisition or Maintenance of Monopoly Power
 
 
 201
 In addition to proving monopoly power in the relevant market, an antitrust plaintiff must also show that the defendant willfully acquired or maintained that power. United States v. Grinnell Corp., 384 U.S. 563, 570, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966); Borough of Lansdale v. Philadelphia Electric Co., 692 F.2d 307, 311 (3d Cir.1982).[73] The plaintiffs concede that York lawfully acquired its monopoly power; therefore, the relevant issue is whether the plaintiffs adduced sufficient evidence to demonstrate that York "willfully" maintained this power. The only evidence that plaintiffs offered on this point was the testimony of their expert that M.D.s have a strong economic interest in excluding D.O.s from access to York Hospital because, if D.O.s are given access to York on the same terms and conditions as M.D.s, M.D.s will be forced to compete directly and on equal terms with D.O.s. This testimony is a sufficient basis on which to imply an anticompetitive purpose on the part of the M.D.s in excluding the D.O.s, but it does not explain an economic motive on the part of the hospital to discriminate against D.O.s.
 
 
 202
 On this point, the uncontradicted evidence of both the plaintiffs' and the defendants' experts was that York, like any hospital, would maximize its revenues by giving staff privileges to every qualified doctor who applied. Hospitals are in the business of providing facilities (rooms and equipment) and support staff (nurses, administrators, etc.). These resources are fixed in the short run, and the hospital maximizes its revenues by encouraging competition for its hospital beds and operating rooms. Since only physicians with staff privileges can admit and treat patients, York can maximize competition for its facilities by granting staff privileges to every qualified doctor who applies. Excluding D.O.s on the other hand, is likely to weaken York's monopoly position in the long run, since a potential rival, such as Memorial Hospital, would have an incentive to provide competing services for the D.O.s excluded from York.
 
 
 203
 Recognizing this problem with their section 2 claim, plaintiffs assert that, although the hospital itself has no economic reason to discriminate against D.O.s, the hospital's medical staff, which as a matter of law is a single entity with the hospital, see supra text preceding note 51, is a combination of M.D.s, each of whom have a strong economic motive to exclude D.O.s. Thus, the plaintiffs argue, we should ascribe the anticompetitive motives of the individual M.D.s to the hospital.
 
 
 204
 There are two problems with this argument. First, the fact that the individual M.D.s who make up the medical staff have parallel anticompetitive motives was the reason we concluded that, as a matter of law, the medical staff is a combination of doctors within the meaning of section 1. We believe, however, that it would be improper to attribute the economic motive of the M.D.s' to York because the M.D.'s motive is to restrict competition in a market in which York is not involved, and because in fact York's economic interest is directly contradictory to that of the individual doctors. Second, even if the anticompetitive motive of the individual doctors could be attributed to the hospital, the actions taken in furtherance of that motive have nothing to do with the maintenance of York's monopoly position; restricting the access of D.O.s to York will not aid York in maintaining that monopoly power.
 
 
 205
 In sum, we conclude that there is no evidence that York "willfully" maintained its monopoly position as the dominant provider of inpatient health care services in the York MSA. For this reason we reverse the district court's finding that York violated section 2 of the Sherman Act.
 
 
 206
 C. The Propriety and Scope of the Injunction under Section 16 of the Clayton Act
 
 
 207
 The final issue we must confront is the propriety and scope of the injunction granted by the district court. The defendants challenge both the propriety of injunctive relief in this case, and the scope of the injunction issued. We conclude that the issuance of an injunction was within the discretion of the district court, but that, given the fact that we have modified the district court's conclusions concerning liability of the defendants under sections 1 and 2, the district court should reexamine the scope of that injunction.
 
 
 208
 Section 16 of the Clayton Act,[74] which authorizes injunctive relief in private antitrust cases, focuses on "threatened loss or damage" resulting from a violation of the antitrust laws, and it authorizes an injunction when and under the same conditions as injunctions are granted by "courts of equity." See Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573, 589-94 (3d Cir.1979); Jeffrey v. Southwestern Bell, 518 F.2d 1129, 1132 (5th Cir.1975). Mindful of the language and purpose of section 16, courts have held that, in order to be entitled to injunctive relief, plaintiffs in an antitrust suit "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Mid-West Paper, 596 F.2d at 591.
 
 
 209
 The jury found that both Weiss and the class had been injured by discriminatory admission practices at York,[75] and the district court adopted both of these findings. Weiss, 548 F.Supp. at 1051-52 (findings of fact Nos. 5 & 9). In addition, the district court expressly concluded that "absent an injunction, there is no guarantee that the injuries by the York Hospital and the York Hospital Medical and Dental Staff will abate." Weiss, 548 F.Supp. at 1058. Thus the district court concluded that there was a significant threat of injury from a continuing violation of the antitrust laws. Id. (citing Mid-West Paper, 596 F.2d at 594 n. 85).
 
 
 210
 The defendants suggest two reasons for their contention that the jury's findings that Weiss and the class were injured by the defendants' conduct are unsupported by any evidence in the record of this case. First, they claim that there is no evidence on which the jury could have based its conclusion that the medical staff discriminated against D.O.s, and therefore, if the staff did not discriminate against D.O.s, then the D.O.s could not have been injured by the staff. We have already concluded, however, that there was substantial evidence supporting the jury's conclusion of discrimination, and therefore we reject the defendants' contrary contention. Second, defendants suggest that primary care physicians, such as Weiss and the majority of the D.O. class members, do not need hospital admitting and attending privileges because they can provide their services solely by "visiting" their patients at York, and that therefore the plaintiffs were not injured by the alleged discriminatory conduct in denying them staff privileges.[76] We agree with plaintiff that:This suggestion is preposterous .... [A] primary care physician will frequently need to admit his patients to the hospital and participate in their hospital care. (5262a-5265a) As the physician with greatest familiarity with a patient, he is often the best one to coordinate the varied consultations, diagnostic services and therapeutic applications necessary to track down and treat disease. (Id.; 5903a; 3553a; 3572a) Often, he will have primary responsibility for the hospital management of a primary disease with a specialist having the responsibility for treatment of complications. Id. Like the specialist, if a primary care physician is foreclosed from privileges at York Hospital, he loses the ability to admit and treat patients there and the patient income which would otherwise be attributable thereto.
 
 
 211
 Plaintiffs' Brief at 57 n. 25.
 
 
 212
 Because the district court's conclusion that Weiss and the class were threatened with significant injury due to the discriminatory treatment of D.O.s at York is supported by the evidence, we conclude that the court did not abuse its discretion in granting injunctive relief pursuant to section 16.
 
 
 213
 The injunction issued by the district court in this case was tailored to prevent possible future harm to Weiss and the class resulting from further discriminatory practices at York:
 
 
 214
 Pursuant to the Court's authority under 15 U.S.C. Sec. 26, this Court hereby declares that the following equitable relief shall be entered against Defendants York Hospital and York Hospital Medical and Dental Staff:
 
 
 215
 1.1 The York Hospital and the York Hospital Medical and Dental Staff are restrained and enjoined from undertaking any overt act against either Plaintiff Weiss or members of the Plaintiff Class which would in any way impede or deny the Plaintiffs full, reasonable, fair, or equal access to the facilities of York Hospital and full, reasonable, fair or equal access to staff privileges at the York Hospital.
 
 
 216
 1.2 The York Hospital and the York Hospital Medical and Dental Staff are restrained and enjoined from applying standards of review to applications by osteopathic physicians for staff privileges at the York Hospital different from the standards of review applicable to similar applications of allopathic physicians.
 
 
 217
 1.3 The York Hospital and the York Hospital Medical and Dental staff are restrained and enjoined from interpreting the expression "American Board of Medical Specialty" as used in the York Hospital Medical Staff By-Laws to exclude osteopathic boards of medical specialty.
 
 
 218
 Weiss, 548 F.Supp. at 1061. Our scope of review over questions of the scope of an injunction issued pursuant to section 16 is abuse of discretion, William Goldman Theatres, Inc. v. Loew's, Inc., 164 F.2d 1021 (3d Cir.), cert. denied, 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948), and it appears that the injunction entered in this case falls within allowable discretion. However, given the fact that we have modified the district court's conclusions concerning the liability of the defendants under sections 1 and 2, we believe that the prudent course is to remand to the district court to reconsider the proper scope of injunctive relief given our decision on the sections 1 and 2 claims. Accordingly, we remand the question to the district court so that it may consider whether or not the injunction should be modified. We do, however, note our concern that certain phraseology within the order might be subject to overbroad interpretation ("full ... access ... to the facilities"), though we leave that matter to the district court as well.[77]
 
 V. CONCLUSION
 
 219
 In summary, we reach the following conclusions. First, we find that the district court's decision that the medical staff violated Sherman Act section 1 as to the plaintiff class is supported by sufficient evidence, and we therefore will affirm the district court on this point. Since we also conclude that, as a matter of law, there was no distinction between Weiss and the class for purposes of injunctive relief under section 1, we hold that Weiss was entitled to the same relief as the class on that claim. Second, since there was no evidence adduced at trial that York engaged in any willful conduct designed to acquire or maintain its monopoly power, we will reverse the district court's finding of liability in favor of Weiss and the class and against York on section 2 grounds. Third, we also agree that the issuance of an injunction by the district court in this case was proper. Although the scope of the injunction also appears to fall within the district court's discretion, given our modification of the district court's determinations on the liability of the defendants under Sherman Act sections 1 and 2, we will remand the case to the district court for reconsideration of the scope of the injunction in light of our opinion here.
 
 
 220
 On remand, the court will also have to try the damage claims, affording the defendants the opportunity to raise the defenses that members of the class did not make demand for staff privileges, and that any such application, including that of Weiss, was properly refused because of the doctor's lack of professional competence or character. See supra note 18. To the extent that the district court may have addressed the latter question with respect to Weiss in its findings and judgment, we grant a partial new trial. Finally, although we did not address the question in the text, we have concluded, see supra note 29, that the district court's decisions absolving various of the defendants on various of the claims, which decisions are based on the jury's answers to the special verdict questions, are supported by the evidence, and we therefore will affirm them.[78]
 
 
 
 *
 After the oral argument Judge Adams recused and did not participate in the resolution of this appeal
 
 
 [1]
 Dorland's Illustrated Medical Dictionary defines Osteopathy as:
 a system of therapy founded by Andrew Taylor Still (1828-1917) and based on the theory that the body is capable of making its own remedies against disease and other toxic conditions when it is in normal structural relationship and has favorable environmental conditions and adequate nutrition. It utilizes generally accepted physical, medicinal, and surgical methods of diagnosis and therapy, while placing chief emphasis on the importance of normal body mechanics and manipulative methods of detecting and correcting faulty structure.
 Osteopathic physicians signify their degree as D.O.
 
 
 [2]
 The York MSA is the area surrounding York Hospital and includes most of York County, Pennsylvania. The area was designated by the Pennsylvania Health Systems Agency as part of that state agency's system of regulation of the provision of health care in Pennsylvania. For purposes of this case the York MSA was found by the jury to be the relevant geographic area within which to measure York Hospital's economic power
 
 
 [3]
 Allopathy is defined as a system of remedial treatment in which it is sought to cure a disease by producing, through medicines, a condition incompatible with the disease. See Funk & Wagnalls New Standard Dictionary of the English Language (1942). Allopathy constitutes the common or "regular" system of medical practice. Allopathic doctors, signify their degree as M.D
 
 
 [4]
 At trial Dr. Merle S. Bacastow, an M.D. and the Vice-President of Medical Affairs at York, testified that at least since the mid-1960's there has been no difference in terms of medical training and ability to provide medical care between graduates of osteopathic medical schools and graduates of allopathic medical schools. App. at 3806a-3809a & 4014a-4015a. This observation is born out by the fact that osteopaths and allopaths are equally qualified for state licensure to practice medicine and surgery within the Commonwealth of Pennsylvania. Compare Pa.Stat.Ann. tit. 63, Sec. 271.1 et seq. (Purdon 1984) ("Osteopathic Medical Practice Act") with Pa.Stat.Ann. tit. 63, Sec. 421.1 et seq. (Purdon 1984) ("Medical Practice Act of 1974"). See also Blackstone, The A.M.A. and The Osteopaths: A Study of the Power of Organized Medicine, 22 Antitrust Bulletin 405, 408-14 (1977). Professor Blackstone concludes that in general D.O.s receive somewhat shorter, less expensive, and less specialized training than today's highly specialized M.D.s. Id. at 408-10. He states that this difference may justify limitations on the privileges of osteopaths that are similar to limitations imposed upon general practice M.D.s and family practitioners, but that it would not seem to justify the total exclusion of osteopaths. See id. at 411; Kissam, Webber, Bigers, and Holzgraefe, Antitrust and Hospital Privileges: Testing the Conventional Wisdom, 70 Calif.L.Rev. 595, 641 n. 218 (1982) [hereinafter cited as Antitrust and Hospital Privileges ]: Dolan & Ralston, Hospital Admitting Privileges and the Sherman Act, 18 Houston L.Rev. 707, 728 (1981) ("Osteopaths undergo training regimens quite similar to that of M.D. practitioners, except that greater emphasis is placed on family practice and on some manipulative practices. Regardless of the situation thirty years ago, it is highly unlikely that any significant qualitative difference between the two groups exists today.")
 
 
 [5]
 The facts set forth below were culled from the evidence presented to the jury
 
 
 [6]
 The record does not reveal how many employees Memorial has
 
 
 [7]
 "Tertiary care" is a term used by the parties in this litigation to signify highly specialized "third level" hospital care. Testimony at trial indicated that there are three "levels" of hospital care. The first or primary level involves "the relationship between patient and physician usually in an outpatient setting." The second level usually involves "the application of a specialist, an internist in a hospital setting." The third or tertiary level is the "most sophisticated type of care involving intensive care and the use of subspecialists." App. at 5133a-38a
 
 
 [8]
 There appear to be two major reasons why Memorial does not offer tertiary care services and facilities. The first reason relates to the availability of the necessary equipment. State and federal regulations require a hospital to first obtain a "certificate of need" before purchasing expensive equipment. These certificates will not be issued when another hospital in the same service area already has the equipment and that other hospital can handle the total patient demand for that service in that area. Note, Health Professionals' Access to Hospitals: A Retrospective and Prospective Analysis, 34 Vanderbilt L.Rev. 1161, 1183-84 (1981); Blumstein & Sloan, Redefining Government's Role in Health Care: Is a Dose of Competition What the Doctor Should Order?. 34 Vanderbilt L.Rev. 849, 920-924 (1981); Blumstein & Calvani, State Action As A Shield and a Sword in a Medical Services Antitrust Context: Parker v. Brown in Constitutional Perspective, 1978 Duke L.J. 389, 435-437 (1978). Since most tertiary care equipment is highly sophisticated and thus very expensive, and since York already possesses the equipment and can handle the total patient demand for the York MSA. Memorial cannot obtain the required "certificates of need" to purchase tertiary care equipment for itself. The second reason is medical training. Tertiary care is only provided by highly specialized physicians. Because most D.O.s do not highly specialize, see Blackstone, supra note 4, at 407 & 427, there are few who are qualified to provide tertiary care services. By contrast, M.D.s tend to highly specialize, even outside large metropolitan areas, id., hence an M.D. hospital like York is a natural place for providing tertiary care services
 
 
 [9]
 Apparently Memorial acquired a CAT scan during the course of this litigation
 
 
 [10]
 See generally Dolan & Ralston, supra note 4, at 713-714
 
 
 [11]
 See also Dolan & Ralston, supra note 4, at 714
 
 
 [12]
 In the ten years proceding the date of the trial, York and its staff received approximately 200 applications by M.D.s. During this period the only M.D. to ever be denied privileges was suffering from psychiatric problems. The presumption enjoyed by M.D.s was even strong enough to permit the admission to staff privileges at York of a certain Dr. "A" [actual name held confidential by the district court] even after the following report was made to the medical staff by one of its senior members based on extensive personal evaluation:
 [Dr. A] has demonstrated poor judgment in decisions about therapy without obtaining all the facts at hand or necessary to make these judgments or decisions. Moreover he has proceeded in an over-confident manner such as administration of hydrochloric acid ... to correct metabolic alkalosis where other modes of therapy were indicated. I have discussed these actions with him but they tend to recur. He answers questions about events and dates on patients without knowing the facts. He is not able to provide total patient care. He has serious deficiencies in medical knowledge. And moreover compounds these deficiencies by neglecting to obtain the facts before treatment of patients.
 
 
 [13]
 Since the time of Weiss' application for staff privileges, six other D.O.s have applied to York. Of those six, five were accepted and one application is dormant awaiting supplementation by the applicant. Thus eight D.O.s have applied to York since the medical staff bylaws were changed, and only one applicant--Dr. Weiss--has been rejected. Weiss, 548 F.Supp. at 1053 (findings of fact Nos. 36-40). The defendants assert that these facts can only be interpreted to mean that the defendants did not discriminate against D.O.s and that D.O.s are not dissuaded by fear of rejection from applying to York hospital for staff privileges. The plaintiffs counter that the jury reasonably concluded that during the pendency of this litigation the defendants had decided not overtly to discriminate against D.O.s and that the six D.O.s who applied since Weiss' rejection anticipated this decision. The district court apparently agreed and in addition concluded that many more than six D.O.s would have applied for staff privileges at York but for York's discriminatory treatment of D.O.s and the adverse professional consequences of rejection. Weiss, 548 F.Supp. at 1058
 
 
 [14]
 For a discussion of the relationship between the Medical Staff Executive Committee and the Board of Directors, see generally Antitrust and Hospital Privileges, supra note 4, at 641. ("[B]ecause the medical staff, like an agency, has 'the authority' to evaluate applicants for privileges, the hospital board functions as a reviewing court that recognizes substantial discretion in the staff and upholds the staff's decision if it is supported by any 'rational basis' or 'substantial evidence.' "); See also Dolan and Ralston, supra note 4, at 711-712 ("[F]ormalities are misleading .... [T]he significant entity in the application process is the medical staff.")
 
 
 [15]
 The hearing proceedings are stenographically transcribed, but the committee is not bound by the strict rules of evidence
 
 
 [16]
 The ordinary procedure is described in Dolan & Ralston, supra note 4, at 712 ("When an application is received, it is referred to the specialty service or services for which privileges have been requested .... After the application is approved or disapproved, it percolates back up through the system where deference to the decision increases as the application reaches higher levels of review. Absent extraordinary circumstances, the decision to grant a physician privileges approved by the relevant entity is rarely overturned by the entire medical staff committee, which makes the ultimate recommendation to the governing board.")
 
 
 [17]
 For example, one M.D., Dr. Bauer, who was contacted by the Committee responded with the following comment:
 [C]oncerning Dr. Weiss, my only contacts with him have been at the York Squash Club social gatherings several years ago. I must confess that at the time I found Dr. Weiss rather outspoken, [and] extremely aggressive, but you must understand that these are only my personal observations at some social functions and do not relate directly to Dr. Weiss' medical training and/or skills.
 
 
 [18]
 For example, one M.D., Dr. Woerthwein, wrote that although he did not know Dr. Weiss personally, "some" of Dr. Weiss' patients had complained that Dr. Weiss' examinations were "superficial" and his diagnoses were "unfounded." Another M.D., Dr. Myers, wrote that an unnamed D.O. on the staff of Memorial had called Dr. Weiss a "rebel" and said that 90% of Dr. Weiss' patients were medical assistance patients whom he sees "at a very fast rate." A third doctor, an D.O. named Dr. Kammer, reported that Dr. Weiss' contract with Memorial to work in that hospital's emergency room was terminated because Dr. Weiss "related so badly to people of the lower socio-economic class." However, this contention was directly contradicted by other evidence that Dr. Weiss (and Dr. Zittle) had resigned from service in the emergency room because of a dispute over their salary. Finally, the Committee received a letter from Dr. Herman, an M.D., stating that he had been told by someone working in the York office of the Pennsylvania Department of Public Assistance that the office had received "many complaints from patients about incomplete exams by Dr. Weiss and about his lack of rapport with them."
 Although it was not known to the committees at York considering Weiss' application for staff privileges, and only revealed in discovery proceedings in this case, the defendants adduced certain evidence tending to show that Dr. Weiss was discourteous to nurses in areas of the hospital where patients might have overheard and been distracted. This evidence was contained in hospital files that the defendants characterized as business records, but the evidence was never admitted, apparently either because the defendants did not authenticate the records or because the district court exercised its discretion to exclude them under Fed.R.Evid. 403 (they were offered solely for impeachment purposes). App. at 5160a-5171a. It is possible that this evidence may be offered again, and we express no view concerning its admissibility at that time since no objection was taken by the defendants to its exclusion at the first phase of this trial.
 
 
 [19]
 The Executive Committee was composed of Doctors Ardison, Bauer, Butler, Kline, and Kushner. These five physicians are named defendants
 
 
 [20]
 The vote was six for denial of the application, five for acceptance, one abstaining, and two absent
 
 
 [21]
 The Committee consisted of Doctors Laucks, MacDougall, MacKenzie, Whiteley, and Deisher. These five doctors are named defendants
 
 
 [22]
 The ten individual defendants were added in an amended complaint after the district court granted the defendants' motion to dismiss the initial complaint
 
 
 [23]
 On May 28, 1981, following a two-day hearing, the district court granted plaintiff's motion for class action certification, determining that the action could be maintained under Fed.R.Civ.P. 23(b)(2) on behalf of a class of all osteopathic physicians practicing medicine in the York MSA. On September 25, 1981, the district court denied the motion by all defendants for summary judgment. Weiss v. York Hospital, 524 F.Supp. 433, 442 (M.D.Pa.1981)
 Subsequently the defendants sought two writs of mandamus and prohibition from this Court. In one matter, No. 81-2191, the petition was directed to the district court's certification of the plaintiff class. This Court denied the petition holding that mandamus and prohibition were not available. In the other matter, No. 81-2171, the court denied a petition directed to the district court's order authorizing discovery of confidential income data of approximately 100 M.D.s in the York area until completion of the liability portion of the bifurcated trial, and retained--and still retains--jurisdiction in the matter. The opinion in both matters is reported as DeMasi v. Weiss, 669 F.2d 114 (3d Cir.1982).
 Thereafter, defendants filed a motion before the district court to decertify the class. The motion was denied on August 18, 1982.
 
 
 [24]
 There were three sets of "findings" made during the trial of this case. First, the jury made findings when it answered the 42 special verdict questions propounded to it by the district court. Weiss, 548 F.Supp. at 1051. Second, the district court, in a written opinion subsequent to the jury verdict, made 40 findings of fact, the first 28 of which were explicitly based on (and in fact were merely restatements of) the jury's answers to the special verdict questions. Id. at 1051-53. Third, the remaining 12 findings of fact were apparently made by the district court in its role as a court of equity deciding whether or not to issue an injunction against the defendants. In addition, of course, the district court made conclusions of law which were essentially molding the jury's answers into verdict form. Id. at 1060-61
 
 
 [25]
 The defendants have provided the following chart, which is helpful in visualizing the district court's conclusions of law:
 -------------------------------------------------------------------------
 Defendants Sec. 1 Sherman Act Sec. 2 Sherman Act State Law
 (Weiss & Class) (Weiss & Class) (Weiss Only)
 Monop./Attempt/Consp.
-------------------------------------------------------------------------
York Hospital -- W&C W&C W&C W
York Hospital
 Medical Staff C -- -- -- --
Ardison -- -- -- -- --
Bauer -- -- -- -- W
Butler -- -- -- -- W
Diesher -- -- -- -- W
Kline -- -- -- -- --
Kushner -- -- -- -- W
Laucks -- -- -- -- --
MacDougall -- -- -- -- --
MacKenzie -- -- -- -- --
Whiteley -- -- -- -- --
-------------------------------------------------------------------------
 W = Liable to named plaintiff
 C = Liable to class
 -- = Exonerated
-------------------------------------------------------------------------
 
 
 [26]
 The injunction was entered on September 30, 1982, and the defendants appealed it on October 28, 1982, within the thirty days provided by Fed.R.App.P. 4(a)(1). However, on October 12, 1982, the defendants made a motion under Rule 50(b) for judgment notwithstanding the verdict or for a new trial and that motion was not denied by the district court until November 22, 1982. Under the rule announced in Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 103 S.Ct. 400, 74 L.Ed.2d 225 (1983), a timely-filed Rule 50(b) motion prevents the parties from appealing the judgment until the district court decides the motion. See Fed.R.App.P. 4(a)(4). Therefore, if the defendants Rule 50(b) motion was timely filed, the October 28th appeal was void. Fortunately for defendants, however, their Rule 50(b) motion was not timely filed because it was brought one day late, see Turner v. Evers, 726 F.2d 112, 113 n. 2 (3d Cir.1984) (explaining computation rules of Fed.R.Civ.P. 6(a)), and therefore the appeal from the injunction was valid. Fed.R.App.P. 4(a)(4)
 
 
 [27]
 Rule 54(b) states:
 (b) Judgment Upon Multiple Claims or Involving Multiple Parties. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.
 
 
 [28]
 The case was not certified under 28 U.S.C. Sec. 1292(b), nor does it fall under the collateral order or other judge-made exceptions to the finality doctrine
 
 
 [29]
 The final judgments entered against plaintiff Weiss are:
 --on the section 1 claim: in favor of York, the staff, and all individual defendants;
 --on the section 2 claim: in favor of the staff and all individual defendants;
 --on the state law claims: in favor of the staff and Doctors Ardison, Kline, Laucks, MacDougall, MacKenzie, and Whiteley.
 The final judgments entered against the plaintiff class are:
 --on the section 1 claim: in favor of York and all individual defendants;
 --on the section 2 claim: in favor of the staff and all individual defendants;
 --on the state law claims: the class made no state law claims.
 We affirm all the dismissals as to the individual defendants because we believe the evidence supports the jury's conclusions on these claims. We also affirm the dismissal of Weiss' and the class' section 2 claims, against the medical staff, on the same ground. We reverse the dismissal of Weiss' section 1 claim against the medical staff for the reasons stated infra text accompanying notes 52-63. Finally, we affirm the dismissal of Weiss' and the class' claims against York because we believe that these decisions are also supported by evidence in the record. We note however that exoneration of York Hospital on the section 1 claims does not necessarily result in the dismissal of the action as to York. The medical staff (which the jury found liable on section 1 grounds, and which decision we affirm, see infra text accompanying notes 43-66) does not exist independent of the hospital, and therefore the hospital may be liable to pay any award of money damages in favor of the plaintiffs and against the staff under section 4 which may result in the future, on a respondeat superior theory of liability. We leave this question to another day.
 
 
 [30]
 We reserve the question of the right of class members to recover treble damages under section 4 of the Clayton Act in the absence of a demand. See infra note 32
 
 
 [31]
 Moreover, even beyond the requirement of causation, the federal courts, where "pervasive reasons of antitrust policy" warrant, have fastened certain artificial limitations upon the plaintiff's right to recover treble damages. See generally Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454-55 (3d Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). For example, in Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the court concluded that, in view of the potential for duplicative recoveries and problems of proof, the right to recover damages for price fixing should generally be confined to the direct purchasers of the price-fixed products
 
 
 [32]
 We express no view as to whether a demand is required in non-(b)(2) class situations. Nor do we decide whether the individual members of a (b)(2) class must prove a demand and refusal in order to recover treble damages under section 4 of the Clayton Act. That matter will have to be resolved in a subsequent phase of this case
 
 
 [33]
 The scope of review of an order denying or granting a motion to maintain a class is narrow. "If the district court properly applies the relevant criteria, we may reverse its order only for an abuse of discretion." Mazus v. Dept. of Transp., Commonwealth of Pa., 629 F.2d 870, 876 (3d Cir.1980), cert. denied, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); see Paton v. La Prade, 524 F.2d 862, 875 (3d Cir.1975); Katz v. Carte Blanche Corp., 496 F.2d 747, 756-57 (3d Cir.) (en banc), cert. denied, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974)
 
 
 [34]
 Weiss v. York County Hospital, Civ. No. 80-0134, at 3 (M.D.Pa. filed 3/28/81) (findings of fact Nos. 8-10) [App. at 1507a]
 
 
 [35]
 On the subject of how many is enough, Professor Moore has written:
 While the attitude taken towards a given number may vary, each opinion reflects a practical judgment on the particular facts of the case. Thus no hard and fast number rule can or should be stated, since "numerosity" is tied to "impracticability" of joinder under the specific circumstances. Nevertheless, some general tendencies can be observed. While there are exceptions, numbers under twenty-one have generally been held to be too few. Numbers between twenty-one and forty have evoked mixed responses and again, while there are exceptions, numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement.
 3B J. Moore, Moore's Federal Practice p 23.05, at 23-150 (2d ed. 1982) (footnotes omitted).
 
 
 [36]
 Professor Moore has concluded that there is no need for this subsection at all, "since all meanings attributable to it duplicate requirements prescribed by other provisions in Rule 23." 3B J. Moore & J. Kennedy, Moore's Federal Practice p 23.06-2, at 23-185 (2d ed. 1982). Some courts have equated typically with commonality, while others have held that it is more akin to the Rule 23(a)(4) requirement that the representative party adequately protect the interests of the class. 4 Newberg on Class Actions Sec. 7983. See 7 C. Wright & A. Miller, Federal Practice and Procedure Sec. 1764 (1972) and cases cited therein. Still other courts and commentators have attempted, quite correctly we think, to ascribe an independent meaning to Rule 23(a)(3) and have posited various tests by which the court may determine whether the prerequisite has been met. A widely utilized formulation has been that advanced in 7 Wright and Miller, supra, Sec. 1763, at 614:
 ... [P]laintiff has satisfied Rule 23(a)(3) if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory. Of course, when this is true the standard under subdivision (a)(3) is closely related to the test for the common-question prerequisite in subdivision (a)(2). On the other hand, Rule 23(a)(3) may have independent significance if it is used to screen out class actions when the legal or factual position of the representatives is markedly different from that of other members of the class even though common questions of law or fact are raised.
 This approach focuses on the legal and/or factual stance assumed by the class representative as compared with that of the class members. Under this approach, while factual variations will not defeat certification where the various claims arise from the same legal theory, where the named plaintiff's individual circumstances are markedly different or where the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based, there exists the danger that the unique circumstances or legal theory will receive inordinate emphasis and that the other claims will not be pressed with equal vigor or will go unrepresented. Wofford v. Safeway Stores, Inc., 78 F.R.D. 460, 489 (N.D.Cal.1978); Karan v. Nabisco, Inc., 78 F.R.D. 388, 405 (W.D.Pa.1978); Cohen v. Uniroyal, Inc., 77 F.R.D. 685, 691-92 (E.D.Pa.1977). ("[M]ere anticipation that all class members will benefit from the suit ... is not enough. But interests sufficiently parallel to ensure a vigorous and full presentation of all potential claims for relief should satisfy Rule 23(a)(3)"). See Scott v. University of Delaware, 601 F.2d 76, 84 (3d Cir.), cert. denied, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979). Illustrative of this approach is Donaldson v. Pillsbury Co., 554 F.2d 825 (8th Cir.), cert. denied, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977), in which the court described the typicality prerequisite variously as a requirement that there be other members of the class who have the same or similar grievances, id. at 830; that the charge be based on patterns or practices not special or unique to plaintiff, id. at 831; that a significant number of other members of the class have been similarly victimized by the same patterns or practices. Id.
 The approach of Donaldson and of other courts adopting the Wright and Miller formulation thus appears to be an attempt to attribute semantic integrity to the term "typicality," by using what is essentially its common sense definition and positing that where the plaintiff's factual or legal stance is not characteristic of that of other class members, the typicality prerequisite has not been met. In something of a variation of the above analysis, other courts have held that in order to satisfy the typicality requirement, plaintiff must show that the issues of law or fact he or she shares in common with the class occupy "the same degree of centrality" to his or her claims as to those of unnamed class members. Parker v. Bell Helicopter Co., 78 F.R.D. 507 (N.D.Tex.1978); Cottrell v. Virginia Electric & Power Co., 62 F.R.D. 516 (E.D.Va.1974); see Wofford, 78 F.R.D. at 489. A similar formulation is the "nexus text." See Hannigan v. Aydin Corp., 76 F.R.D. 502, 508 (E.D.Pa.1977), a Title VII case where Chief Judge Joseph S. Lord, III wrote that typicality exists where plaintiff has demonstrated some "nexus" with the claims of other class members, which can be shown by demonstrating the similarity between the conditions of employment of plaintiff and those of other class members, the similarity between the alleged discrimination practices on the named plaintiff and that affecting the class, and by the compatability of the relief requested and that appropriate for the class.
 We view the "centrality" and "nexus" tests as functionally indistinguishable from the Wright-Miller/Donaldson "marked difference" formulation; each test attributes to the typicality requirement what we have termed a semantic integrity by focusing on its dictionary or common sense meaning. We see no point in attempting an additional formulation, for we could not improve on the foregoing.
 
 
 [37]
 In Falcon, a Mexican-American employee filed suit in federal court under Title VII claiming racial discrimination in defendant's refusal to promote him. Without conducting a hearing on whether the prerequisites of Rule 23(a) were met, the district court, pursuant to the Fifth Circuit's rule permitting the victim of racial discrimination in employment to maintain an "across-the-board" attack on all the employer's racially discriminatory policies, certified a class consisting of Mexican-American employees of the employer and Mexican-American applicants who had not been hired by the employer. The Supreme Court rejected the contention that the requirements of Rule 23(a) could be by-passed in Title VII cases. Instead, the Court held that the requirements of Rule 23(a) "limit the class claims to those fairly encompassed by the named plaintiff's claim." 457 U.S. at 156, 102 S.Ct. at 2370 (citing General Telephone Co. of the Northwest, Inc. v. EEOC, 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980)). The Court went on to hold that it was error for the district court to presume "[w]ithout any specific presentation identifying the questions of law or fact that were common to the claims of [the plaintiff] and of the members of the class he sought to represent," that the plaintiff's claims against the employer were typical of the claims of other Mexican-American employees and applicants. Id. 457 U.S. at 158, 102 S.Ct. at 2371
 
 
 [38]
 Fed.R.Civ.P. 23(b)(2) provides:
 (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 ....
 (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole:
 ....
 
 
 [39]
 The trial in this case was held at the Lewisburg/Williamsport Courthouse because the district court determined that no courtrooms were available in the Harrisburg courthouse during the time scheduled for the trial
 
 
 [40]
 We note that by its express terms section 1393(a) does not appear to apply to this case because this suit is not against a "single defendant," but against multiple defendants. However, the section has been applied by several district courts to cases where multiple defendants all reside in the same division. See, e.g., McCroskey v. Texas Marine Survey Co., Inc., 87 F.R.D. 691 (S.D.Tex.1980); Roark v. Bauer, 181 F.Supp. 330 (N.D.Ohio 1960); Lavietes v. Ferro Stamping & Mfg. Co., 19 F.Supp. 561 (E.D.Mich.1937); Barfield v. Zenith Tire & Rubber Co., 9 F.2d 204 (N.D.Ohio 1924); see generally 1 J. Moore, Moore's Federal Practice p 0.143, at 1466 (2d ed. 1984); see also Torres v. Continental Bus System, Inc., 204 F.Supp. 347 (S.D.Tex.1962) (statute applies to a corporate defendant that is a resident of the division). Because we hold that section 1393 applies only to congressionally created divisions, we need not decide here whether we would extend the statute to cases involving multiple defendants
 
 
 [41]
 In order to demonstrate that they were substantially harmed by having the trial held at Lewisburg/Williamsport rather than Harrisburg the defendants point to 28 U.S.C. Sec. 1861, which guarantees all litigants the right to a trial before a jury "selected at random from a fair cross section of the community in the district or division wherein the court convenes." The defendants argue that, if the trial had taken place in Harrisburg as allegedly required by 28 U.S.C. Sec. 1393(a), they would have had a jury from the Harrisburg area--one "drawn from a community containing the diversity of minority groups who inhabit both York itself and the Harrisburg Division, but [ ] not found in any substantial number in the rural counties from which juries in Lewisburg and Williamsport are drawn." Defendants' Brief, at 64--and that, with such a jury the outcome of the trial might well have been different
 
 
 [42]
 Local Rule 407.1 of the Middle District Rules does not require a different result. Rule 407.1, which is merely precatory, provides that the trial should be held as close as practical to the defendant's place of residence or principal place of business. Local Rule 407.3 provides that "notwithstanding any other provisions of this Rule, in all actions the court shall have the right to designate the place of trial for the convenience of the court or of all the parties and witnesses." In this case the district court attempted to accommodate the convenience of all concerned. Trial was scheduled for Lewisburg/Williamsport only after the district court determined that no courtroom was available in Harrisburg. Its decision in this regard certainly cannot be characterized as an abuse of discretion
 Our conclusion that the district court did not err as a matter of law in trying the case in Williamsport should not, of course, be taken as a suggestion that the ensuing phase of the trial also be tried in Williamsport as opposed to Harrisburg.
 
 
 [43]
 If corporate officers or employees act for their own interests, and outside the interests of the corporation, they are legally capable of conspiring with their employer for purposes of section 1. See Johnston v. Baker, 445 F.2d 424, 426-27 (3d Cir.1971); see also H & B Equipment Co., Inc. v. International Harvester Co., 577 F.2d 239, 244 (5th Cir.1978); Greenville Publishing Co., Inc. v. Daily Reflector, Inc., 496 F.2d 391, 399 (4th Cir.1974). In Copperweld the Supreme Court noted this exception but did not otherwise comment on it. 104 S.Ct. at 2741 n. 15. Because the jury did not find any of the named individual defendants to be conspirators, we do not have occasion to discuss this exception further
 
 
 [44]
 The district court instructed the jury:
 York Hospital is a corporation and as such it can act only through its employees, officers or representatives. The York Hospital does not violate the Sherman Act if it exercises its rights through its officers and agents, which is the only medium through which it can possibly act: likewise the corporation cannot conspire with its unincorporated division here, the medical and dental staff of the York Hospital.
 Thus I instruct you that York Hospital and the Medical and Dental Staff of York Hospital must be regarded by you as a matter of law as a single entity which cannot conspire with itself.
 App. at 5685a.
 
 
 [45]
 Special Verdict No. 13 took the following form:
 
 
 [13]
 If your answer to the previous question is "yes," check the name or names of the Defendants listed below who were involved in that conspiracy
 York Hospital ------
 York Hospital Medical and Dental
 Staff X
 Gary Ardison, M.D. ------
 Thomas L. Bauer, M.D. ------
 Ivan L. Butler, M.D. ------
 S.W. Deisher, M.D. ------
 Jack A. Kline, M.D. ------
 Lois Kushner, M.D. ------
 S. Philip Laucks, M.D. ------
 Harold H. MacDougall, M.D. ------
 Iain L. MacKenzie, M.D. ------
 John P. Whiteley, M.D. ------
 App. at 6250a. It would appear that since the court instructed the jury that the hospital was one in the same with the medical staff and that therefore it was legally impossible for the two to conspire, it was internally inconsistent to provide one space to be checked for York Hospital and a separate space for the York Hospital Medical and Dental Staff.
 The jury also believed that the defendants had conspired against plaintiff Weiss:
 
 
 [7]
 Did any of the Defendants conspire with any other person or persons, entity or entities, whether or not a Defendant, to deny Plaintiff Weiss staff privileges at the York Hospital because Weiss was an osteopathic physician?
 Answer: Yes.
 App. at 6243a. However, because the jury concluded that the conspiracy against Weiss did not unreasonably restrain interstate commerce, Special Verdict No. 8, the jury was not required to answer Special Verdict No. 10, which asked them to identify the conspirators.
 
 
 [46]
 Based on the jury's answers to Special Verdict Nos. 13 & 8, the court in its conclusion of law No. 5 stated: "The individual Defendants have not violated the antitrust laws." Weiss, 548 F.Supp. at 1061
 
 
 [47]
 Whether antitrust defendants have engaged in a "contract, combination or conspiracy" to restrain trade is a question of fact. See Theatre Enterprises v. Paramount Film Distributing Corp., 346 U.S. 537, 541-42, 74 S.Ct. 257, 259-260, 98 L.Ed. 273 (1954); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 221 (1939). If there is evidence supporting the jury's finding of a conspiracy, we must affirm. See Dawson v. Chrysler Corp., 630 F.2d 950, 959 (3d Cir.1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981)
 
 
 [48]
 Utilizing this principle, the Supreme Court, in Copperweld, explained why a corporation and its wholly owned subsidiary could not legally conspire:
 A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for Sec. 1 scrutiny.
 Copperweld, 104 S.Ct. at 2742.
 
 
 [49]
 In Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), the Court did not discuss, and indeed seemed to think it was indisputable that the requisite joint action for section 1 purposes was present. However the Court did expressly state that:
 The Sherman Act was specifically intended to prohibit independent businesses from becoming "associates" in a common plan which is bound to reduce their competitor's opportunity to buy or sell the things in which the groups compete. Victory of a member of such a combination over its business rivals achieved by such collective means cannot consistently with the Sherman Act or with practical, everyday knowledge be attributed to individual "enterprise and sagacity"; such hampering of business rivals can only be attributed to that which really makes it possible--the collective power of an unlawful combination.
 326 U.S. at 15, 65 S.Ct. at 1422 (emphasis in original). In Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the Court, on the issue of joint action, stated only:
 The concerted action of the Exchange and its members here was, in simple terms, a group boycott depriving petitioners of a valuable business service which they needed in order to compete effectively as broker-dealers in the over-the-counter securities market.
 373 U.S. at 347, 83 S.Ct. at 1252.
 We acknowledge that there are factual distinctions between Silver and Associated Press on the one hand, and this case on the other. York Hospital is more than simply an association of doctors; it is a separate economic entity which provides services separate from those provided by the doctors on the medical staff. This case, however, involves only the question of the medical staff's decision about which doctors would be allowed to practice at York. For these purposes, we believe that the principles of Silver and Associated Press are applicable.
 
 
 [50]
 We also reject the defendants' argument that because the jury exonerated all defendants except the medical staff of conspiracy, and because there was no evidence of any other possible conspirator, the jury's section 1 verdict cannot stand. Because the medical staff itself is a combination within the meaning of section 1, no other co-conspirators are required for section 1 liability
 
 
 [51]
 In this article the authors examine the role of medical staff members in relation to the hospital and conclude that these physicians should be treated as "outside agents" of the hospital and thus capable of conspiring under the antitrust laws:
 Attending physicians, however, are independent contractors with the hospital for other legal purposes and most of them also provide ambulatory services that are outside the scope of their hospital roles. Such independent physician behavior suggests that the relationship between medical staff members and a hospital is more analogous to the relationship between a corporation and its "outside agents"--lawyers, accountants, advertising firms, and consultants--than to the relationship between a corporation and its salaried employees. Physicians thus may be treated as "outside agents" of the hospital, if not as independent enterpreneurs. Significantly, the precedents are clear that outside agents are separate enough from the corporations they do business with to be treated as co-conspirators under the Sherman Act. Moreover, in the case of physician cartel decisions, there is no independent interest of the hospital, and thus the intraenterprise conspiracy defense would seem to be entirely spurious. The physicians are not acting even arguably as agents, but rather as entirely independent actors who desire to use the hospital for their own anticompetitive purposes.
 Id. (footnotes omitted). Some commentators have suggested the creation of a rebuttable presumption of agreement between the hospital and the medical staff. See Antitrust and Hospital Privileges, supra note 4, at 642; Note, A Suggested Role for Rebuttable Presumptions in the Antitrust Restraint of Trade Litigation, 1972 Duke L.J. 595, 605-624. These authors focus on the relationship between the hospital and the members of its medical staff. We focus instead on the relationship between the entities (individual doctors) who make up the medical staff, and conclude that it is they who provide the requisite joint action element for a section 1 violation.
 
 
 [52]
 Justice Brandeis provided the classic statement of the rule of reason in Board of Trade of City of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):
 The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed: the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
 
 
 [53]
 These costs are a product of the detailed factual analysis necessary to evaluate the myriad of business practices challenged under the antitrust laws. Litigation of the effect or purpose of a practice often is extensive and complex. Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Judges often lack the necessary expert understanding of market structures and behavior to make accurate determinations about a practice's effect on competition. United States v. Topco Associates, Inc., 92 S.Ct. 1126, 1134-1135, 31 L.Ed.2d 515, 405 U.S. 596, 609-10 (1972). One result of the specific nature of a determination under the rule of reason is that prior adjudications may provide little certainty or guidance about the legality of a practice in another situation. Id. at 609 n. 10, 92 S.Ct. at 1134 n. 10; Northern Pacific Ry. Co., 356 U.S. at 5, 78 S.Ct. at 518
 
 
 [54]
 "Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements." Northern Pacific Ry. Co. v. United States, 356 U.S. at 5, 78 S.Ct. at 518 (citations omitted). See United States v. Columbia Steel Co., 334 U.S. 495, 522-23, 68 S.Ct. 1107, 1121-1122, 92 L.Ed. 1533 (1948); Malley-Duff & Associates, Inc. v. Crown Life Ins. Co., 734 F.2d 133, 140 (3d Cir.1984); Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164, 166 (3d Cir.1979)
 
 
 [55]
 These findings are clearly not "critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." Dawson v. Chrysler Corp., 630 F.2d 950, 959 (3d Cir.1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981) (quoting Denneny v. Siegel, 407 F.2d 433, 439 (3d Cir.1969)), and therefore we affirm them
 
 
 [56]
 We use these two terms interchangeably. Professor Sullivan has pointed out that each term has its advantages and disadvantages: "boycott" is cryptic and emotionally charged, but "concerted refusal to deal" is imprecise and in some respects too narrow and in other respects too broad. See L. Sullivan, Handbook of the Law of Antitrust Sec. 83, at 231 (1977)
 
 
 [57]
 If the businesses are controlled at both levels by the same firm, and the divisions at one level of production urge the parent corporation not to deal with their rivals, there is no "concerted refusal to deal" under section 1. Copperweld, --- U.S. ----, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); supra note 48. In this situation, the law assumes that the vertically integrated firm will choose to maximize the profits of the firm as a whole. If the firm can reap a larger profit by selling to or buying from both its subsidiaries on a particular level of production or distribution and their competitors, it will have no incentive to refrain from doing so. The subsidiaries are not in a position to "boycott" their parent; therefore, there can be no coercive behavior by subsidiaries to force a parent to make a decision that is not in the best interests of the company as a whole. As a result, the "concerted refusal to deal" doctrine does not apply in the context of a subsidiary attempting to influence a parent's behavior
 This case can be viewed as presenting the question whether the relationship between York Hospital and the M.D.s is like a parent-subsidiary relationship, or more closely akin to a traditional boycott. But the rationale for treating the parent-subsidiary relationship differently--that the subsidiaries cannot pressure the parent to act against its own interests--does not apply where independent economic entities such as the M.D.s on the medical staff control the staff-privileges decision-making of an entity--York--at another level of production. Therefore we conclude that this case does not involve a parent-subsidiary relationship. We note, in this regard, our cognizance of the fact that the staff-privileges decision of the medical staff is subject to ultimate review by the Hospital Board. However, given the dominant role of the medical staff and the limited nature of the review process in that area, see supra at pp. 796 - 799, we believe that the jury's findings as to the culpability of the medical staff are supported.
 
 
 [58]
 We note that in this case York possesses monopoly power in the York MSA with respect to inpatient hospital health care services. See infra text accompanying notes 71-72. We therefore need not reach the question whether, in order to constitute a per se illegal boycott, a conspiracy to exclude a group of potential competitors from hospital staff privileges requires that the hospital--i.e., the entity at the other level of "production"--possess substantial market power in the relevant market. This distinguishing factor might render the analysis in this case different from the analysis in a large metropolitan area. Cf. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, --- U.S. ----, 104 S.Ct. 1551, 1559, 80 L.Ed.2d 2 (1984) ("According, we have condemned tying arrangements [only] when the seller has some special ability--usually called 'market power'--to force a purchaser to do something that he would not do in a competitive market.")
 
 
 [59]
 As Professor Sullivan notes in his treatise, the initial question in "industry self-regulation" cases is whether the challenged restrictions have the "purpose and effect" of a classical boycott, and the scope of this initial analysis can be "so spacious that it matters little whether the inquiry is described as one aimed at determining whether a per se rule governs or as one in which the rule of reason is being applied, so that a judicial conclusion that 'this is a boycott and the per se rule governs' is very much the same as saying, 'considering everything this joint action is unreasonable.' " Id. Sec. 88, at 248
 
 
 [60]
 In the Professional Engineers case, the Supreme Court stated:
 We adhere to the view expressed in Goldfarb that, by their nature, professional services may differ significantly from other business services, and, accordingly, the nature of the competition in such services may vary. Ethical norms may serve to regulate and promote this competition, and thus fall within the Rule of Reason. But the Society's argument in this case is a far cry from such a position. We are faced with a contention that a total ban on competitive bidding is necessary because otherwise engineers will be tempted to submit deceptively low bids. Certainly, the problem of professional deception is a proper subject of an ethical canon. But, once again, the equation of competition with deception, like the similar equation with safety hazards, is simply too broad; we may assume that competition is not entirely conducive to ethical behavior, but that is not a reason, cognizable under the Sherman Act, for doing away with competition.
 435 U.S. at 696, 908 S.Ct. at 1367-1368 (footnote omitted). In the light of the Supreme Court's subsequent decision in Maricopa County, see text, we read Professional Engineers to hold that where an "ethical norm" of a learned profession is under attack on section 1 grounds, a rule of reason analysis governs even if the per se rule might otherwise apply, but that in order to prevail on the rule of reason inquiry the defendant must demonstrate that the challenged conduct has a pro-competitive effect. Cf. Antitrust and Hospital Privileges, supra note 4, at 644-45 n. 239 (commentators differ on whether Professional Engineers applied the rule of reason or the per se approach).
 We add that the defendants adduced certain evidence that tended to show that Dr. Weiss was boisterous and discourteous to nurses in areas of the hospital where patients might have overheard and have been disturbed. See supra note 18. Although this evidence was not the central focus of the trial--the major issue was whether the defendants applied two levels of scrutiny to applicants; a very deferential review to M.D. applicants and a substantially more rigorous review of osteopathic applicants--we do not doubt that a hospital could exclude an applicant from staff privileges either because he is not medically qualified or because of unprofessional conduct, so long as the hospital applies the same standards to all applicants. This result does not skew our antitrust analysis. First, as to medical ability, restricting staff privileges to doctors who have achieved a specified level of medical ability falls within the scope of a hospital's "public service" function, and therefore the rule of reason analysis, not the per se rule of illegality, would control. Applying the rule of reason analysis, it seems obvious that by restricting staff privileges to doctors who have achieved a predetermined level of medical competence, a hospital will enhance its reputation and the quality of the medical care that it delivers. Thus such action is pro-competitive and, therefore, permissible under the rule of reason. See infra note 61. The analysis for professional conduct is basically identical. The "public service" function of a hospital is to provide for effective and efficient medical treatment for its patients. One factor in the effective and efficient running of a hospital is a medical staff that can work together and be courteous to patients and staff. Doctors who have a history of trouble in interpersonal relations can legitimately be excluded because, if admitted, they will reduce the effectiveness of the medical staff, thereby reducing the ability of the hospital to provide top-flight service. In sum, doctors who have trouble getting along with other people will reduce efficiency, thereby reducing the hospital's competitive position, and, therefore, exclusion of such doctors is pro-competitive and permissible under the rule of reason.
 See generally Dolan & Ralston, supra note 4, at 719, 735.
 
 
 [61]
 Several circuit court opinions have held the rule of reason analysis, not the per se rule of illegality, controls in boycott cases involving the learned professions. We believe these cases are readily distinguishable from the instant case. In Wilk v. American Medical Ass'n., 719 F.2d 207 (7th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984), a case involving the refusal of M.D.s to deal with chiropractors, the Seventh Circuit stated: "boycotts are illegal per se only if used to enforce agreements that are themselves illegal per se --for example price fixing agreements." Id. at 221 (quoting Marrese v. American Academy of Orthopaedic Surgeons, 706 F.2d 1488, 1495 (7th Cir.1983), on rehearing, 726 F.2d 1150 (7th Cir.), cert. granted, --- U.S. ----, 104 S.Ct. 3553, 82 L.Ed.2d 854 (1984)). Since the court could find no per se illegal purpose for the A.M.A.'s medical ethics principle 3, which in essence provided that M.D.'s should not associate with chiropractors, it concluded that the rule of reason analysis governed in that case. We believe that the Seventh Circuit was correct in utilizing a rule of reasons analysis in the Wilk case because the defendants were plainly asserting a "public service or ethical norm" justification for their concerted refusal to deal with chiropractors. In Virginia Academy of Clinical Psychologists v. Blue Shield of Va., 624 F.2d 476, 484-85 (4th Cir.1980), the Fourth Circuit stated: "Because of the special considerations involved in the delivery of health services, we are not prepared to apply a per se rule of illegality to medical plans which refuse or condition payments to competing or potentially competing providers." First, we note that the Fourth Circuit did not have the benefit of the Supreme Court's opinion in Maricopa when it decided Virginia Academy, and indeed the court cited the Ninth Circuit's opinion in Maricopa, which was subsequently reversed by the Supreme Court, as support for its decision that the rule of reason governed. Second, a "medical necessity" justification was apparently raised by the defendants, and in our view that would have been sufficient to bring the defendants within the purview of Maricopa's exception for conduct based on "public service or ethical norms."
 Finally, in Kreuzer v. American Academy of Periodontology, 735 F.2d 1479 (D.C.Cir.1984), the D.C. Circuit Court held that the rule of reason analysis governed a section 1 challenge to a rule promulgated by the American Academy of Periodontology (AAP) that limited membership in the AAP to licensed dentists who practice periodontics exclusively, and who do not practice other forms of dentistry. The court labeled the effect of the AAP's rule a "group boycott" but concluded that "[w]hen a conspiracy of this sort is alleged in the context of one of the learned professions, the nature and extent of its anticompetitive effect are often too uncertain to be amendable to per se treatment." Id. at 1492. We believe the "boycott" involved in the Kreuzer case is not a classical boycott, in that a group of competitors at one level of production--i.e., the periodontists--were not trying to use their position to coerce some entity on some other level of production to discriminate against competitors of the periodontists, and therefore Kreuzer is inapposite to the facts of the instant case.
 Even if we were to conclude that a rule of reasons analysis governs in this case simply because a learned profession is involved, we would conclude that the defendants' conduct here was an unreasonable restraint because: (1) Weiss met his burden of production and persuasion that the purpose and effect of the defendants' discriminatory conduct was to "foreclose so much of the market from penetration by [the M.D.s'] competitors [i.e., the D.O.s] as to unreasonably restrain competition in the affected market, the market for [inpatient medical care]," see Jefferson Parish Hosp. Dist. No. 2 v. Hyde, --- U.S. ----, 104 S.Ct. 1551, 1568 n. 51, 80 L.Ed.2d 2 (1984), and (2) the defendants--who relied solely on the defense they had not discriminated against D.O.s--made no attempt to counter this evidence.
 
 
 [62]
 After the jury returned its answers, Weiss moved for judgment in his favor on the section 1 count, notwithstanding the jury's determination that the defendants' conduct did not constitute an unreasonable restraint as to him, on the grounds that the per se rule of illegality should have been applied to defendants' conduct. Weiss, 548 F.Supp. at 1054. In response, the district court stated:
 Since Plaintiff Weiss has otherwise established liability of the York Hospital and the York Hospital Medical and Dental Staff to him under the antitrust laws, the Court need not decide at this time whether the conspiracy to deny Plaintiff Weiss staff privileges at the York hospital is in violation of the Sherman Act.
 Id. The court did not include in its order any specific declaration that Weiss did not prevail as to section 1.
 
 
 [63]
 This interstate impact requirement has been construed as an element of both jurisdiction and the substantive offense under the Sherman Act. See Mortensen v. First Federal Savings & Loan Ass'n. 549 F.2d 884, 890-91 (3d Cir.1977). The inquiry is the same for both elements. Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); Englert v. City of McKeesport, 736 F.2d 96 (3d Cir.1984)
 
 
 [64]
 Another formulation of the test, which apparently has the same meaning, is that the conduct must have a "not insubstantial effect" on interstate commerce
 
 
 [65]
 At trial the plaintiff presented evidence demonstrating that York's business activities had a substantial effect on interstate commerce. York's gross patient revenue for an average year was approximately 50 million dollars. App. at 493a. The testimony indicated that York made substantial purchases of drugs and equipment in interstate commerce. App. at 4505a. In addition York routinely treated out-of-state patients and billed them at their out-of-state residences. App. at 4473a-4475a. Finally, the overwhelming majority of patient bills were paid by third party payors (i.e., private insurance companies and federal and state insurers) many of whom are located outside Pennsylvania. App. at 4473a-4475a. Based on this evidence, the jury found that: "(1) the Defendants engaged in business activities in interstate commerce. Special Verdict No. 1; (2) Defendants' conduct concerning Plaintiff Weiss and the Plaintiff class occurred in interstate commerce, Special Verdict No. 2; (3) the Defendants' conduct had a 'not insubstantial effect' on interstate commerce, Special Verdict No. 3; and (4) the Defendants' conduct concerning Plaintiff Weiss and the Plaintiff class had a 'not insubstantial effect' on interstate commerce, Special Verdict No. 4." Weiss, 548 F.Supp. at 1051 (findings of fact Nos. 1-4)
 
 
 [66]
 Most of the evidence on interstate impact concerned York Hospital's activities in interstate commerce, however, only the medical staff was found liable under section 1. We conclude that this discrepancy is irrelevant because the medical staff does not exist independent of the hospital, and therefore the hospital's activities in interstate commerce are attributable to the medical staff also
 
 
 [67]
 Section 2, like section 1, also contains the requirement that there be a substantial effect on interstate commerce; that requirement has been met in this case. See supra text accompanying notes 63-66
 
 
 [68]
 In the typical antitrust action the defendant attempts to prove the widest (and the plaintiff the narrowest) possible market. This is true because the fraction of the relevant market controlled by the defendant will usually be the most important indicator of monopoly power. Thus the larger the product market is, the larger the denominator of the equation will be, thereby decreasing the percentage of the defendant's market power and consequently the probability of establishing an offense. See Dolan & Ralston, supra note 4, at 763-764
 
 
 [69]
 In Grinnell Corp., which involved "central station protection" against losses such as burglary, fire, water overflow, and the like, the defendants there made essentially the same argument as that made by defendants here:
 Defendants argue that the different central station services offered are so diverse that they cannot ... be lumped together to make up the relevant market. For example, burglar alarm services are not interchangeable with fire alarm services.
 384 U.S. at 571-72, 83 S.Ct. at 1704. The Supreme Court squarely rejected that argument, upholding a single service market for central alarm protection:
 But there is here a single use, i.e., the protection of property through a central station that receives signals.... We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities.
 Id. at 572, 83 S.Ct. at 1704.
 
 
 [70]
 On this point the district court charged the jury:
 To repeat, in this case the Plaintiffs claim that the relevant product market is that of inpatient hospital health care supplied by hospitals and their medical staffs. You must determine whether Plaintiff has carried his burden of proof that this alleged market in fact exists and is the narrowest relevant product market.
 App. at 5702a.
 
 
 [71]
 This is precisely how the concept was defined to the jury in the district court's charge:
 Monopoly power is defined as the power to control prices or exclude competition in a relevant market. Therefore you must determine whether the Defendants could either control prices or exclude competition in the relevant product market.
 App. at 5702a.
 
 
 [72]
 The general rule was stated by the Supreme Court in Grinnell Corp.:
 In United States v. E.I. du Pont de Nemours & Co., ... we defined monopoly power as "the power to control prices or exclude competition." The existence of such power ordinarily may be inferred from the predominant share of the market. In American Tobacco Co. v. United States, ... we said that ... "over two-thirds of the entire domestic field of cigarettes, and * * * over 80% of the field of comparable cigarettes" constituted "a substantial monopoly." In United States v. Aluminum Co. of America, ... 90% of the market constituted monopoly power. In the present case, 87% of the accredited central station service business leaves no doubt that the congeries of these defendants have monopoly power ....
 384 U.S. at 571, 86 S.Ct. at 1704. See also International Boxing Club of N.Y., Inc. v. United States, 358 U.S. 242, 249, 79 S.Ct. 245, 249, 3 L.Ed.2d 270 (1959) (81% market control is sufficient to establish monopoly power); United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 389-90, 76 S.Ct. 994, 1003-1004, 100 L.Ed. 1264 (1956); Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 33, 31 S.Ct. 502, 505, 55 L.Ed. 619 (1911) (90% is enough); United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2d Cir.1945) (90% is enough, 60% not likely enough, and 33% not enough). The courts consider more than just the percentage of the market share in determining monopoly power. Other relevant factors that the courts have identified include: the size and strength of competing firms, freedom of entry into the field, pricing trends and practices in the industry, ability of consumers to substitute comparable goods on services from outside the market, and consumer demand factors. A defendant's power either by itself or aided by these other factors must be enough to restrict entry, supply, or price. See L. Sullivan, Handbook of the Law of Antitrust Secs. 22-32 (1977); see also Dolan & Ralston, supra note 4, at 767.
 
 
 [73]
 This requirement represents a policy judgment that a firm that has acquired and maintained its position as a monopolist because of "growth or development as a result of superior product, business acumen, or historic accident," id., and not through anticompetitive conduct, should not be liable under the antitrust laws for its success
 
 
 [74]
 The text of section 16 is set forth supra text following note 31
 
 
 [75]
 As to Weiss, the jury concluded that "but for the fact that he was an osteopathic physician rather than an allopathic (M.D.) physician" he would have been granted staff privileges at York. Special Verdict No. 5. As to the plaintiff class, the jury concluded that the defendants' discriminatory actions "cause[d] injury to members of the Plaintiff class other than the Plaintiff in their business and property." Special Verdict No. 12
 
 
 [76]
 During the pendency of this class litigation, six out of the ninety-two class members applied and were accepted for staff privileges at York. Defendants contend that the admission of these six osteopaths, combined with the fact that Weiss is the only osteopath to ever be turned down for staff privileges at York, eliminated any threat of harm resulting from defendants' exclusionary conduct. The district court considered this contention and concluded that members of the plaintiff class nevertheless continued to be dissuaded from applying for staff privileges at York because of York's continued dual-track admissions policy. The court went on to find that the class collective fear that they would not be treated equally with M.D. applications was reasonable, despite the recent trend to admit osteopathic applicants, because denial of staff privileges is a significant adverse professional event for a physician. This conclusion is not clearly erroneous. Cf. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 131-32, 89 S.Ct. 1562, 1580-1581, 23 L.Ed.2d 129 (1969) ("Neither the relative quiescence of the [conspiracy] during litigation nor claims that objectionable conduct would cease with the judgment negated the threat to [plaintiff's] foreign trade. That threat was too clear for argument, and injunctive relief against [defendant] ... was wholly proper."]
 
 
 [77]
 We emphasize that we have not mandated that the district court should order York to admit Dr. Weiss. The plaintiffs requested this injunctive relief and the district court refused. The district court's injunction is tailored to require that the defendants treat M.D.s and D.O.s equally. Since the defendants have publicly maintained that they do treat M.D.s and D.O.s the same, the district court's injunction hardly seems burdensome
 
 
 [78]
 Defendants have requested that on remand the matter be reassigned to a different judge. We see no basis for so exercising our supervisory powers